EWING et al. v. GOODE.

(Circuit Court, S. D. Ohio, W. D. January 15, 1897.)

1. PHYSICIANS AND SURGEONS—MALPRACTICE.
In order to recover damages from a physician or surgeon for want of proper care and skill, the plaintiff must show, both that the defendant was unskillful or negligent, and that injury was produced by his want of skill or care.

2. SAME—DAMAGES.
Mere lack of skill or negligence without injury gives no right to recover even nominal damages.

3. SAME—WARRANTY.
A physician is not a warrantor of cures, in the absence of an express contract to that effect. His implied obligation arising from his employment is only that no injury shall result from any want of care or skill on his part.

4. EXPERT EVIDENCE—WEIGHT AND VALUE.
Expert evidence in cases where the subject of discussion is on the border line between general and expert knowledge, as in questions of value, is not conclusive upon court or jury, but the latter may draw their own inferences from the facts, and accept or reject the statements of experts; but upon questions involving a highly specialized art, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence; and, when there is no such evidence to support an allegation depending upon such a question, there is nothing to justify submitting the issue to the jury.

5. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE.
Upon a review of the evidence in this case, held, that there was no evidence to justify the submission to the jury of the question whether the defendant, a physician, had been negligent in his treatment of the plaintiff.

On Motion to Direct a Verdict for Defendant at the Close of all the Evidence.

Blackburn & Rhyno, for plaintiffs.
Smith & Kuhn, for defendant.

**TAFT, Circuit Judge.** In this case the petition of Nellie Ewing, the plaintiff, alleges that she employed the defendant, Goode, a surgeon and oculist, to cure her of a certain malady of her eye, for a reward to be paid therefor; that defendant entered upon such employment, but did not use proper care and skill in the operating on the eye of plaintiff, and did not bestow proper attention and treatment upon the eye after the operation, causing her to suffer great pain, and to lose the right eye entirely, and to impair the sight of her left eye. The answer of the defendant denies unskillfulness or lack of attention on his part and any injury to the plaintiff caused thereby.

It is well settled that in such an employment the implied agreement of the physician or surgeon is that no injurious consequences shall result from want of proper skill, care, or diligence on his part in the execution of his employment. If there is no injury caused by lack of skill or care, then there is no breach of the physician's obligation, and there can be no recovery. Craig v. Chambers, 17 Ohio St. 253, 260. Mere lack of skill, or negligence, not causing injury, gives no right of action, and no right to recover even nominal damages. This was the exact point decided in the case just cited.

In Hancke v. Hooper, 7 Car. & P. 81, Tindal, C. J., said:

"A surgeon is responsible for an injury done to a patient through the want of proper skill in his apprentice; but, in an action against him, the plaintiff must show that the injury was produced by such want of skill, and it is not to be inferred."

Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskillful or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, "Res ipsa loquitur," were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the "ills that flesh is heir to."

The preliminary question for the court to settle in this case, therefore, is whether there is any evidence sufficient in law to sustain a verdict that defendant was unskillful or negligent, and that his want of skill or care caused injury. In the courts of this and other states the rule is that if the party having the burden of proof offer a mere scintilla of evidence to support each necessary element of his case, however overwhelming the evidence to the contrary, the court must submit the issue thus made to the jury, with the power to set aside the verdict if found against the weight of the evidence. In the federal courts this is not the rule. According to their practice, if the party having the burden submits only a scintilla of evidence

to sustain it, the court, instead of going through the useless form of submitting the issue to the jury, and correcting error, if made, by setting aside the verdict, may in the first instance direct the jury to return a verdict for the defendant. Hence our inquiry is: Does the case now submitted show more than a scintilla of evidence tending to show want of skill or care by defendant, or injury caused thereby? Railway Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463.

In many cases, expert evidence, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts, and accept or reject the statements of experts; but such cases are where the subject of discussion is on the border line between the domain of general and expert knowledge, as, for instance, where the value of land is involved, or where the value of professional services is in dispute. There the mode of reaching conclusions from the facts when stated is not so different from the inferences of common knowledge that expert testimony can be anything more than a mere guide. But when a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury. When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither. Louisville & N. R. Co. v. East Tennessee, V. & G. Ry. Co., 22 U. S. App. 102, 114, 9 C. C. A. 314, and 60 Fed. 993; Ellis v. Railway Co., L. R. 9 C. P. 551.

These facts may be taken as undisputed in this case:

Mrs. Ewing, the plaintiff, lives with her husband in Covington, Ky. He was, during the time of the existence of the professional relation between his wife and the defendant, a printer, engaged in the office of the Commercial Gazette Printing Office, in this city. Dr. Goode is a highly-educated and experienced physician and oculist of the city, now engaged solely in treating diseases of the eye. In September, 1894, Mrs. Ewing began to feel a haziness in her right eye. It grew worse, so that in the spring of the next year she consulted Dr. Tangiman, an oculist of this city. He told her that she had cloudiness of the lens. Becoming dissatisfied with his treatment, she went, upon the recommendation of Dr. Kebler, her family physician, to consult Dr. Goode. He examined her, and told her that she had cataracts in both eyes; that an operation would soon have to be performed on the right eye. Plaintiff's own expert witness, Dr. Buckner, who examined the left eye in June, 1896, confirms the statement that there is a cataract in the left eye. Cataract is

a disease of the lens of the eye, which renders it cloudy and opaque, and prevents the passage through it of the rays of light, which in its normal condition it focuses on the retina. The operation for cataract is an operation by which the whole lens is removed from the capsule covering in which it is inclosed and suspended in the eye. The removal is usually effected by cutting a passageway for it, through the cornea and the iris, both of which are situated in the eye in front of the lens. This may be done at the same time with the main operation, or long enough before to permit the healing of the wound necessary in cutting before the removal of the lens. The defendant pursued the latter course. The auxiliary operation is called the "preliminary iridectomy." It was performed on the 8th day of July, 1895. It was a smooth and successful operation. The wound healed quickly. No inflammation or formation of pus ensued. On the 25th of September following, the main operation was performed. Through the passageway in the iris, an instrument was inserted, and the covering of the lens capsule was ruptured, and then the lens was gently pressed out through this opening and through the hole cut in the iris in the preliminary operation. The operation was smooth and successful, and after a week or 10 days the wounds were nicely healed. Close attention was given by the defendant and his assistant, Dr. Heflebower, to see that no piece of the iris tissue should be caught or incarcerated in the lips of the wound. No inflammation or pus followed the operation. There was pain in the right eye on the first day, which was relieved apparently, and at least for a time, by a loosening of the bandage. The treatment pursued after each operation was that approved by the medical profession. After 10 days, three to four tenths of vision was found to be restored to the right eye by the use of the cataract glass, which is the lens needed to supply the place of the lens which was extracted. By the use of the ophthalmoscope, the whole interior of the eye was explored; the media were found to be clear; and all the parts were normal. After two or three weeks, the plaintiff was abl to go about, and upon the 19th of October came from her home, in Covington, to visit the defendant, and paid him $10 on his bill of $100. An examination of the eye showed that it was in good condition, and the test for vision was as stated above. The treatment testified to, and not denied, up to this time, was in accord with the best approved views of the profession. During this period, the plaintiff visited Shillito's store several times, and did some of her housework at home, and on the 11th of November came again to visit the defendant, and to pay him $10. He examined the eye, and found it in good condition, without the slightest indication in it that there was anything wrong. On the 19th of November, the plaintiff complained of pain, and another examination of the eye was had, but no cause for the pain was found in an exploration of it with the ophthalmoscope. The complaints of pain continuing, the defendant attributed it to neuralgia of the fifth nerve, because there was no other explanation of it, and applied leeches to the flesh surrounding the eye upon the 24th. The pain continued, and in the first week of December the defendant and Dr. Heflebower again carefully examined the eye at defendant's

office, and confirmed their conclusion that the pain was neuralgia. On the 8th of December, which was Sunday, in the absence of the defendant from his office, the husband of the plaintiff called Dr. Heflebower to assist the plaintiff, and relieve her from pain, of which she was complaining bitterly. He again examined the eye with the ophthalmoscope, and found no evidence of reason for the pain in the eye, and fortified his previous judgment that it was only neuralgic pain. He prescribed a drop of cocaine and powders of phenacetine and salol to relieve the neuralgia. On the next day, upon the 9th of December, which was Monday, Heflebower saw Goode, and advised him of his visit. Defendant visited plaintiff that day, and, after a thorough examination of the eye, thought he detected a slight increase in the tension of the right eye, but was doubtful of it. Although the eye had been carefully examined since July 8th for tension, never until this date had there been the slightest evidence of an increase.

Increased tension of the eyeball is the predominant sympton of the disease of the eye known as "glaucoma." This is a disease the causes of which are but little understood. It is supposed to be an abnormal increase of the secretions of the inner eye, and a consequent pressure of one part of the eye against another, so as to close and stop up the canal for the escape of the eye's secretions, known as the "filtration angle." It may appear in an eye unaffected by injury or disease, in which case it is called "simple glaucoma." It may appear in an eye diseased or injured, in which case it is called "secondary glaucoma." The name "secondary glaucoma" does not necessarily indicate that it is caused by the prior condition of the eye. In cases of simple glaucoma there are, perhaps, 50 per cent. of recoveries. In cases of secondary glaucoma, owing to the diseased or enfeebled condition of the eye when glaucoma sets in, the percentage of recovery is much reduced; and, when it sets in after an operation for cataract, the eye is almost certainly doomed. Glaucoma can rarely be diagnosed in the absence of an increased tension. It is frequently accompanied by pain, and the media of the eye become obscured or cloudy, and vision is lessened; but, in the absence of increased tension, the other symptoms do not indicate glaucoma. There are but two remedies for glaucoma. One is the use of a drug called "eserine," and the other is the cutting of a passageway through the cornea and iris, into the cavity of the eye, to open a canal for the release of the secretions. The reason why, in secondary glaucoma, after a cataract operation, hope of recovery is so slight, is that just such a passageway has already been cut for the removal of the cataract, and, if that does not serve to relieve the pressure, the chance that a second one will do so is very very small.

On the 9th of December, when the defendant visited the plaintiff, and suspected slight increased tension, he prescribed eserine. The prescription was not filled till the 11th. It directed the use of a drop a day in the eye. The phenacetine prescribed by Heflebower to relieve the pain he approved the use of. On the 10th of December, defendant visited plaintiff again, and found that

there was no increased tension, and no other evidence in the eye itself of glaucomatous conditions, though the pains continued.   He confirmed his conclusion that no increased tension existed by an-other visit and examination, on the 11th of December.   After that he remained in the city until the 18th, and received no call from the plaintiff.   He then left for Pittsburg, to perform an operation, and to spend the Christmas holidays.   He asked Dr. Heflebower, a competent oculist, who was familiar with the plaintiff's case, and whom plaintiff had called in before when she could not get defend-ant to attend to plaintiff's case should she call for him.   Whether she did call Dr. Heflebower, and whether he went over or not, are mat-ters of evidence in dispute.   He says that he went twice about Christ-mas or later, and found the eye in good condition, with no increased tension; that she was taking the eserine, but that the pain continued; and that he attempted to relieve her by continuing the phenacetine, and by hot applications.   Plaintiff denies that Heflebower was at her house in December.   On the 6th of January, defendant returned, and answered a call from plaintiff, and, on examination of the eye, found increased tension, amounting to +1, and distinct symptoms of glauco-ma.   He requested her to come to his office, which she did, with her husband; and there both he and Heflebower examined the eye, and, finding glaucoma beyond a doubt, determined upon a second iri-dectomy.   It was performed on January 8th.   This was with the hope of relieving the pain, with the hope of retaining the eyeball in the head by preventing an inflammatory result, and making the dead eye quiescent, and with the very remote possibility of saving what sight there was left in the eye.   The operation was performed. The iris was again clipped, but beneath the pupil this time, in-stead of above, as before; and in a short time the wound healed, without inflammation or pus.   It was for the third time a smooth operation, but it did not prevent the pain.   The defendant attended the plaintiff frequently until the 4th of February, when he was discharged.   The plaintiff then went to Dr. Debeck, an oculist, and was treated by him for a month; then to Dr. Keeny, and was treat-ed by him for six weeks; and finally to Dr. Buckner, who found the eye inflamed and congested, and a menace to the other eye, in that it was likely to cause sympathetic ophthalmia therein.   He advised extraction, and, after consulation with Dr. Sattler, the eye was removed, late in June, 1896, and a glass eye substituted, with the result of relieving the left eye, which, though affected with peripheral cataract, still affords the plaintiff some vision.

The facts above given, except where otherwise expressly stated, are either admitted by plaintiff, or are established by uncontradicted evi-dence.   The chief difference of fact between the plaintiff and defendant is in the time when it is said that pain was present in the right eye, and when it was in the left eye.   Plaintiff said she had pain constantly in the right eye from the first to the third operation, from July 8, 1895, until January 6, 1896, and in her left eye from the time of the second operation, September 25th, until after the third opera-tion.   Defendant and Heflebower say that there was no pain, ex-cept immediately after the second operation, until November 19th,

and that at no time was there complaint of pain in the left eye. The other important difference is as to the two visits of Heflebower to plaintiff about Christmas time, during defendant's absence in Pittsburg. The plaintiff called Dr. Buckner to the stand as an expert oculist. He described in detail how the operations performed by the defendant should have been performed, and his evidence left not the slightest doubt that the course pursued by defendant in respect to the operations and subsequent treatment was in accordance with the best professional opinion. He stated with emphasis that glaucoma setting in 80 days after the second operation, and double that time after the first operation, could not be attributed to the operations as a cause. He stated, further, that though pain was a frequent accompaniment of glaucoma, and a symptom that required close examination of the interior eye to discover its seat, and a careful testing for increased tension, yet, if there was no increased tension, and the eye was clear and normal to its fundus or bottom, when seen through the ophthalmoscope, he should diagnose the pain, as defendant and Dr. Heflebower had, as due to neuralgia, requiring treatment of the nerves. It seems to me clear to a demonstration, therefore, that the evidence for plaintiff utterly fails to show that the first two operations had any causal relation to the glaucoma, or that there was the slightest want of skill or negligence in the performance or subsequent treatment of the wounded eye.

It is conceded that neuralgia is one of the most difficult diseases to control, and there is nothing to show that the failure to control it, even if it existed as constantly as plaintiff's witnesses testify, is evidence of a want of skill or attention. She concedes that she was able to go about to attend to her household duties. Her husband lost but the time immediately succeeding each operation necessary to nurse her. There is nothing to show that the treatment for neuralgia administered by the defendant was not proper, in the use of leeches, of phenacetine and salol, and hot applications.

It only remains to consider whether there is more than a scintilla of evidence upon which to base the claim that the defendant was negligent after the 9th of December, when he suspected, but doubtfully, the presence of increased tension. Heflebower, who saw the patient the night before, on the 8th, and who looked into the eye with the ophthalmoscope, and had made the other usual examination, had found no increased tension, and on the 10th and 11th the defendant could discover none. Out of abundant caution, he prescribed the eserine on the 9th, and the plaintiff took it from the 11th on (how long is not quite clear). Defendant did not see plaintiff during the next week. He thought from his full examination of the 9th, 10th, and 11th, and from Heflebower's of the 8th, that there was no ground for further fear of glaucoma, and that, if any change took place, plaintiff would call him up. It appears from the expert evidence that slight variation in tension in an eyeball, like this one of the 9th, may occur in a healthy eye. There is a suggestion in the evidence of plaintiff that defendant promised to come when it was necessary, and so the burden was on

him; but her own evidence is by no means positive or clear on this point, and the admitted fact that the telephone was put in on December 14th, just to permit her to call him when she needed him, and her statement that, as the pain increased, she did call him, show beyond a doubt that she did not regard herself as obliged to wait his coming. Now, she says the pain grew worse and worse, and that she called the defendant's office repeatedly by telephone, and could not get him. She cannot state that she called him after the 11th of December, and before the 18th of December. Nor could this have been so, because he was in the city until that time, and must have heard from her had she called. After that time he had arranged that Dr. Heflebower should answer his calls.

As to the right of Dr. Goode to leave the city on the 18th of December, when his patient had not called him for a week, and while she was presumably following the precautionary and alleviating prescriptions of eserine and phenacetine, I do not think there can be any doubt, if he made provision for the attendance of a competent oculist in case of a call. The custom of the profession, as testified to by Dr. Buckner, certainly justifies it. What the degree of liability of defendant for the act of the physician he substituted is, is an interesting question; but it is not of importance in this case, for nothing unskillful on Dr. Heflebower's part is shown. Whether Dr. Heflebower was, in fact, called and went, is in dispute, but certainly defendant made arrangements for the purpose. If his office girl failed to tell the plaintiff that defendant's patients during his absence were to apply to Dr. Heflebower, this failure would probably be chargeable to defendant; and to this extent, in the plaintiff's case, there may be some evidence to go to the jury tending to show neglect. Of course, the defendant's office girl testifies that she did tell plaintiff to call up Dr. Heflebower, and the latter says that he was called, and made two visits, and the evidence is very clear and satisfactory. But on this issue I am now deciding, I must assume no such evidence to have been introduced. Plaintiff testified herself that she learned, by calling the office of defendant's father, that defendant was out of the city. If so, under all the circumstances, it is difficult to see why she did not then call Dr. Heflebower. Moreover, if she was in increasing pain, as she says she was, in December, why did she not send her husband to learn where defendant was, and why she could not reach him? But, assuming negligence on the defendant's part because of a failure of his office girl to obey his directions, we come to the question whether this is shown to have done the plaintiff any injury thereby. If we accept Dr. Heflebower's statement, then there was no evidence of glaucoma for some time after Christmas. If we ignore his statement, there is no evidence when it appeared, between December 11th and January 6th. Taking the plaintiff's evidence, it was a matter of doubt on January 6th whether the symptoms were unmistakable. Dr. Buckner, the expert produced by the plaintiff, says that he would not make a second iridectomy on an eye already treated for cataract, in which there had been a preliminary iridectomy, until it was conclusively settled that secondary glaucoma

78 F.—29

was present. The degrees of tension in glaucoma are +1, +2, and +3. On the 6th day of January, the tension was but +1, tending to show that the disease, which works so rapidly, had set in, in its unmistakable form, but a short time before. At any rate, there is no evidence to the contrary. But assuming, against defendant, that glaucoma was certainly present on January 6th, there is nothing to show that its symptoms were so manifest at an earlier date that there was any hurtful delay in the operation. Eserine had been prescribed as early as December 9th. A preliminary iridectomy had already been performed, and thus two remedies had been used, and there remained only that which was a dernier ressort, and one from which little, in fact, could be expected. The necessity for an immediate operation is very much greater in cases of glaucoma when there has been no prior operation than in a case like the present. It is admitted that nothing can be done to prevent secondary glaucoma if it sets in, and that, after a cataract operation, the chances of recovery are almost nil. In the light of these facts, it is clear to me that the evidence that plaintiff suffered any injury from defendant's failure to supply another physician during his absence in Pittsburg, because of his office girl's neglect (if she was guilty of any), is not more than a scintilla, if that.

The subsequent history of the case the defendant is not responsible for. There is not the slightest proof of a want of skill in the third operation. The eye itself was in the possession of plaintiff at the last trial. If it had borne any evidence of an unskillful operation, it would doubtless have been offered in evidence. After defendant's discharge, the patient was in the hands of two physicians for two months and a half, and the fact that the deadly disease from which she was suffering finally led to the removal of the eye can be attributed to no lack of skill on the defendant's part. As the extraction of the eye is not an infrequent result in glaucoma, however treated, the unskillfulness and the causal connection cannot both be presumed.

The condition of the plaintiff cannot but awaken the sympathy of every one, but I must hold that there is no evidence before the court legally sufficient to support a verdict in her favor. I should deem it my duty without hesitation to set aside a verdict for the plaintiff in this case as often as it could be rendered, and, that being true, it becomes my duty to direct a verdict for the defendant.