## Kate Graiziger, Appellee, v. Otto W. Henssler, Appellant.

### Gen. No. 27,614.

1. MEDICINE AND SURGERY—*when malpractice not shown by the evidence.* A judgment against a physician for damages from burns alleged to have been caused by unskilful electrical treatment for a lumpy swelling on plaintiff's chest is against the evidence where plaintiff testified that a condition for which defendant had treated her about four years before, the nature and cause of which were

not shown, had continued and resulted in the swelling, that defendant had advised an operation and, on her refusal to undergo it, had treated her with a specified electrical appliance and later with a different one which had burned her, that he had then advised her to see a certain expert, whom she did see but from whom she received no treatment, and that she had then sought treatment from another physician for a condition claimed to have resulted from the burns, where defendant denied using the second appliance and medical experts testified that such an appliance would not have caused burns of the nature complained of, and that defendant's treatment was proper under the circumstances shown, where it appeared that defendant was a qualified physician, and it was not shown that the burns resulted from his treatments.

2. SAVING QUESTIONS FOR REVIEW—*failure to object that motion for new trial not in writing as waiver.* Failure of defendant to file a written motion for new trial as ordered by the lower court is waived where an oral motion was made and after two years was heard, argued and passed upon by the lower court without objection by the opposing party.

Appeal by defendant from the Superior Court of Cook county; the Hon. HUGO PAM, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1922. Reversed with finding of fact. Opinion filed May 9, 1923.

BATES, HICKS & FOLONIE, for appellant.

ANTHONY J. SCHMIDT, for appellee; EDWARD J. MCARDLE, of counsel.

MR. JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal from a judgment of $1,500 obtained by the plaintiff, Kate Graiziger, against the defendant, Dr. Otto W. Henssler, for malpractice.

The controversy grows out of the question whether the defendant by unskilful electrical treatment burned her on the chest about midway between the breasts and, as a consequence, injured her. The defendant had first treated her in 1911 and 1912 for rheumatism, when she had, as she says, "a lot of trouble on the same spot." At that time he told her not to meddle with it, and gave her some salve to apply. On De-

cember 26, 1915, she went back to him. At that time there was a lump about the size of a hickory nut between her breasts, and it had bothered her for about six months. It began to appear first in 1912. The defendant says she then, in 1915, had a swelling, three inches by one and a half, with two pulpy centers, over the sternum, and complained that it hurt her, and that he told her it was not rheumatism, but probably due to some fall or trauma and that she ought to go to a hospital and have an operation, that it would only take about ten days in the hospital, but she said, on account of her age—she was then 52 years old—she did not wish an operation. He then started giving her electrical treatments.

The evidence, as to the particular lamp or instrumentality which he used, and which, it is claimed by the plaintiff, burned her, is uncertain. She testified that he started with what he called the "blue treatment"; that he used a long piece of glass with a tube on the bottom; that from December until February she visited him three or four times a week, and he would apply salve and then use the blue rays; that the treatments would last about an hour and twenty minutes each. Later, about a week before February 25, 1916, it is her testimony, he began using, what she calls, a Nernst film, a funnel-shaped instrument that had red glass over a wire, and on February 25, 1916, applied it and burnt her so that twice she pushed him away, and, upon asking him if she must stand it, he grabbed hold of her and held her while he applied it. Describing her sensations, she testified that it burned her like being scalded with hot water; that afterwards he applied a salve and she went home, but that, arriving about 8:30, it pained her so much she went back to him and told him she could not stand it, and he ordered a druggist to give her some salve which she applied and was somewhat relieved. She further testified that the next morning there was a blister, about as large as a penny or nickel, that had broken, and

several other smaller ones which had developed and broken; that after February 26 he treated her with "blue ray" electricity and gave her medicine to take internally; that the place where the blister had broken got larger and he told her he wished her to go and have a professor give her a surgical examination; that he called up a Dr. Frank and arranged for her to see him; that she went to see Dr. Frank on March 30; that he examined her and asked her, who had done that; that she never went back to Dr. Frank; nor did she again see the defendant. She further testified that she told her husband that Dr. Frank advised an operation, but that her husband objected. On cross-examination, she testified that the defendant used the Nernst and blue rays every time; that it was Dr. Frank and a Dr. Schroth who told her she had been burned; that she told the defendant at the second visit that she had had a fall five or six months before, but that she did not strike her chest.

The defendant, a graduate of the University of Jena, 1892, and who had practiced medicine continuously for twenty-seven years in Chicago, testified that when the plaintiff came to him she had a swelling, three inches by one and a half, with two pulpy centers, over the sternum; that it was probably caused by trauma, probably due to a fall; that he advised her to have a surgical operation but that she said she was afraid of an operation; that he then told her the only thing he could advise was a high frequency treatment, which is the same as the "blue flame"; that he gave her such treatment, each lasting five or six minutes, about twice a week, and in all about twelve treatments; that he gave her no other than high frequency treatments, together with salves and internal medicine. He said he never had a therapeutic or heat-producing lamp; and that the high frequency machine only gives a warm glow; that later he told her the treatments were doing her no good and gave her a letter to Dr. Frank, a skilful operator whom he knew,

and told her to come back and let him know what Dr. Frank thought of it; that that was the last time he ever saw her; that at the time the swelling was practically the same as when he first saw her, and had not broken out. He denied grabbing her or that she pushed him away. He testified, in answer to a hypothetical question, which assumed the general history of the treatment such as he said he gave her, that such treatment was proper. On cross-examination he said that he advised an operation as he was not sure but the trouble was cancerous. He further testified that at the second visit to him she said she had had a fall several months before; that she said to him, "My chest hurt me for a little while but it did not seem to trouble me much."

On March 31, 1916, the plaintiff went to one Schroth, a physician and surgeon, a graduate of the National Medical University, that at one time was in business on Wells street, Chicago, but is now out of existence. He kept for sale "The Sterling Pain Relieving Lamp." He testified that the plaintiff first came to him at his office on March 31, 1916; that she then had a sore about the diameter of a silver dollar between her breasts; that he irrigated it with a boric acid antiseptic solution and used the "Magic Pain Relieving Lamp"; that the treatment was given every day but Sunday until the middle of August; that at first they lasted three hours, and dwindled down to one hour each. His testimony suggests that at the outside he used fifty gallons of solution at a treatment and later less; that at first her breasts were swollen to three or four times their normal size. On cross-examination, when asked, "Would such an infection as you saw there spread around and infect the breasts," he answered, "It did in her case." He says that when he first saw the sore it was open, with a core composed of dead tissue which had no sensation in it; that the water was used to slough it out and reduce the inflammation; that he removed about a square inch of dead tissue with

scissors and forceps; that her condition improved from the first; that he treated her after the middle of August two or three times a week, ending altogether about Christmas that year.

A hypothetical question was propounded to Dr. Schroth which purported to contain the evidence of the plaintiff so far as it tended to show the treatment she received from the defendant and the condition of her breast shortly after she gave up treatments by the defendant. The question ended by asking him whether he had an opinion as to what caused the condition in which the sore was on her breast on March 28, 1916, and he answered that it was caused, in his opinion, by a burn of a lamp. He further stated on cross-examination that in answering the hypothetical question about the lamp, he assumed that the power of the lamp which caused the burn was the power of a somewhat similar lamp that he used himself. He also said that assuming all the evidence in the case his diagnosis would be that the lump might have been caused by a combination of things; that it might be the result of a rheumatic condition or a blow or fall or a disturbance in the blood or associated with anæmia or the result of infectious germs or associated with heat. He further said that it could not be cancer as the patient was still alive. He was also asked to assume the facts stated in the original hypothetical case and then to consider the fact that the lamp was held at a distance of four or five inches from the breast for a period of three to four minutes, and then, whether in his opinion, that treatment was skilful or otherwise, and he answered that it was unskilful treatment. It is, also, in evidence that he did not know the power of the lamp, which, it is claimed by the plaintiff, was used.

The plaintiff testified that the pain from the alleged burn lasted from February 25 until March 1, and that after that it did not hurt; that the place, where the lump was, seemed lifeless, had no feeling in it and caused no pain.

Graiziger v. Henssler, 229 Ill. App. 365.

. Various hypothetical questions, purporting to contain a statement of what the evidence tended to show, were propounded to the defendant, Dr. Haerther and Dr. Curry. Dr. Haerther, a graduate of the medical department of Northwestern University, and who had practiced for thirty-six years, a member of the Chicago, Illinois and American Medical societies, stated that high frequency treatment and the recommendation of surgical treatment, such as was testified to by the defendant, was entirely proper. Doctor Curry, a physician of sixteen years practice, corroborated Dr. Haerther. All three, that is, including the defendant, however, when given an hypothesis purporting to contain a statement of facts such as testified to by Dr. Schroth describing his treatment, stated that in their opinion that was improper and unskilful. Dr. Haerther and Dr. Curry both agreed that the surgical operation which was recommended was proper, and that it would have consisted of opening up the affected part and a removal of the dead tissue, if any existed; that if the operation was objected to, the only thing to do was what the defendant testified he did do. The four doctors, Haerther, Curry, Gross and Eberhart, the last a specialist in electro-therapeutics, all stated that a therapeutic lamp could produce a burn, but that high frequency treatment would not; that a therapeutic lamp is merely a heat-producing apparatus. Dr. Eberhart stated that a therapeutic lamp would produce a burn just as sunlight would, but that it would not involve underlying tissue, only the superficial layers of the skin, the same as heat from sunburn; that if a burn is caused by such a lamp, blisters are formed and, as they break, one spot becomes worse than another; that the blisters are a help; that sometimes the blisters do not heal because of infection; that if they do not heal within a month, he would consider it due to an infection; that a therapeutic lamp is usually used for the relief of pain, the same as a hot water bottle.

On the trial, the plaintiff exhibited the wound to the jury and stated, "It doesn't hurt me now only when I do a little work such as sweeping or washing, then it pulls and hurts when I raise my hands."

In the course of the trial the plaintiff was shown an instrument something in the nature of an electric lamp, which was offered for identification but never subsequently introduced in evidence, and stated that that was what they called a Nernst film, and in answer to a question by the court whether she was treated with anything like that, she said, "I was not treated with that but it looks like that." On the examination of Dr. Schroth, the same instrument was handed to him and upon being asked what it was he answered, "It is a therapeutic lamp"; that it contained a film used in the Nernst lamp. The plaintiff, upon being asked by her counsel to look at the instrument marked, "Plaintiff's Exhibit 1," for identification and to state whether, outside of the size of the funnel, it was in every respect like the lamp that the defendant used on her on February 25, 1916, answered, "It was funnel shaped and larger than this one. It was pointed, longer in the bulb here (indicating) and pointed like the funnel, and it was close in here (indicating) with zig-zag wires around it."

The evidence shows that the defendant treated the plaintiff in 1911 and 1912 for rheumatism, and that at that time, as she herself says, she had "a lot of trouble on the same spot"; that the defendant told her not to meddle with it and gave her some salve to apply to it, and that in December, 1915, she went back to him for treatment, having at that time a lump about the size of a hickory nut on her chest which had bothered her for about six months. The defendant says she then had a swelling three by one and one-half inches with two pulpy centers over the sternum, and complained that it hurt her; that he told her it was not rheumatism but probably due to some fall or trauma, and that she ought to go to a hospital and

have an operation; that she refused to consider an operation and that he then started giving her electrical treatments.

What produced the lump, the original abnormality, is not definitely shown unless we take the judgment of the defendant that it was traumatic. The question arises, did the defendant fail, in his professional treatment of the plaintiff, to exercise ordinary care, caution and skill such as is ordinarily exercised by physicians under similar circumstances and, by reason thereof, caused her unnecessary injury?

To establish liability in such a case it must be shown by expert professional testimony that there was a failure to exercise ordinary professional skill, and that the omission caused injury. There are two substantive elements, unskilfulness and consequent injury, and a procedural element which pertains to the kind of proof essential in showing unskilfulness.

Considering the substantive element of unskilfulness, the law does not require the extraordinary. In the early case of *Ritchey v. West,* 23 Ill. 385, the court stated "that when a person assumes the profession of physician and surgeon, he must, in its exercise, be held to employ a reasonable amount of care and skill." In that opinion there is this language: "For anything short of that degree of skill in his practice, the law will hold him responsible for any injury which may ensue from its absence. While he is not required to possess the highest order of qualification, to which some men attain, still he must possess and exercise that degree of skill which is ordinarily possessed by members of the profession. And whether the injury results for want of skill or the want of its application he will, in either case, be equally liable." That case was followed by *McNevins v. Lowe,* 40 Ill. 209. In the latter case the court stated that an instruction that a physician "was liable for whatever damage may have accrued to the plaintiff by reason of any want of care or skill on his part" was too broad, as only reason-

able care and skill was necessary. Later, in *Quinn v. Donovan*, 85 Ill. 194, as in the *McNevins* case, *supra*, the court stated that a physician and surgeon was required to use "not perhaps the highest degree of skill * * * but reasonable skill, such as physicians in good practice ordinarily use." This latter case holds that an instruction that a physician and surgeon "is liable unless he uses his full skill and ability" for damages caused thereby is too broad. In *Sims v. Parker*, 41 Ill. App. 284, which was a suit for damages for an injury alleged to have been caused by an improperly adjusted truss in a case of hernia, it is said that as evidence of experts in the defendant's profession showed him to be competent and skilful and as he was qualified to practice medicine, before a recovery could be had against him "it must be shown that his treatment was improper or negligent, not merely that he was mistaken or that his treatment resulted injuriously to plaintiff." And further: "The jury cannot draw the conclusion of unskilfulness from proof of what the result of the treatment was, but that the treatment was improper must be shown by the evidence." That case was based upon the *McNevins* case, *supra*.

As to the element of injury, arising as a result of the alleged unskilfulness, it is the obligation of the plaintiff to prove not only a lack of ordinary care on the part of the defendant, but in addition thereto, that some injury occurred as a consequence. In other words, the defendant is not liable merely because he failed to exercise ordinary care but is only liable when it is also proven that some injury has resulted therefrom. Further, the principle of *res ipsa loquitur* does not apply. The mere fact that the abnormal condition, which existed at the time of the treatment complained of, for a time grew worse, is not of itself any evidence that the treatment was unskilful. A medical practitioner is not an insurer. *McKee v. Allen*, 94 Ill. App. 147; *Ewing v. Coode*, 78 Fed. 442.

Considering the procedural question as to the kind of proof that is essential, in a situation where the abnormal condition is complex, and its nature and cause unknown, and concerning which a layman can have no valuable knowledge, the court must rely on the evidence of professional medical practitioners. *Goodman v. Bigler,* 133 Ill. App. 301; *Kruger v. McCaughey,* 149 Ill. App. 440; *Moline v. Christie,* 180 Ill. App. 334.

It is contended on behalf of the plaintiff that there is evidence that the defendant in his treatment used a particular lamp which burned and injured her. She says that he used two lamps, one to give, what she called, the blue treatment, and another which she called a "Nernst film," which she likened to a lamp which was produced at the trial and marked for identification but not admitted in evidence. The defendant denies having used any instrumentality other than the high frequency lamp. Very naturally the plaintiff was unable to give a clear description of the two lamps that he used in treating her. But, apart from the question whether the defendant used a therapeutic or high frequency lamp, it becomes necessary to determine whether the evidence sufficiently shows that the defendant by unskilful treatment burned her or caused any unnecessary injury to her. She had been troubled with rheumatism and something abnormal had occurred which produced a lump on her chest and caused her pain. She was in that condition when she went to him in 1915. It had given her trouble for three or four years. The defendant, apparently concluding that it was not caused by rheumatism, made some inquiries of her as to whether she had had a fall, and later recommended her to go to the hospital and have an operation. That conduct, of course, is not to be complained of. Are we able, then, to say from the evidence that the pain that she suffered, and of which she complains, and the alleged exacerbation of the condition, were caused by the electrical treatment which he gave her.

Dr. Eberhart stated that a therapeutic lamp would produce a burn just as sunlight would but that it would not involve underlying issue, only the superficial layers of the skin, the same as heat from sunburn; that if a burn is caused by such a lamp blisters are formed and if they break one spot becomes worse than another, but that the blisters are a help. He further stated that sometimes the blisters do not heal on account of infection and that if they do not heal within a month he would consider it due to an infection.

The evidence seems to show that when afterwards she went to Dr. Schroth the condition had changed, to just what extent, however, we are not told. He says that when she first visited him on March 31, 1916, she had a sore about the diameter of a silver dollar between her breasts and that he irrigated it with great quantities of a boric acid antiseptic solution and used his "Magic Pain Relieving Lamp." He also says that when he first saw the sore it was open with a core composed of dead tissue which had no sensation in it, and that he removed about a square inch of dead tissue with scissors and forceps. There is no evidence in the record that that condition, which Dr. Schroth described, was caused by the electrical treatment given the plaintiff by the defendant. It may be that the defendant in using the lamp, whether it was high frequency or a therapeutic lamp, caused the plaintiff some acute pain, which she describes as a burn like scalding, but it does not follow that that was the result of unskilful conduct or that it was the cause of the condition becoming subsequently such as it was when she went to Dr. Schroth. What the interior condition of the lump was at the time she went to the defendant and was given electrical treatments by him, no one knows. The defendant testified that he thought it might be cancerous. The evidence fails to show that the change in the condition of the sore from what it was on February 25, 1916, before he treated her that day and the condition it was in when she went

to Dr. Schroth was caused by the electrical treatment which the defendant administered. If we assume that he used a lamp with sufficient heat even to blister the skin and to give her the pain of which she complains, it by no means follows that that treatment was the source of a subsequent running sore and the production of dead tissue which Dr. Schroth says he cut out.

In our judgment the evidence, upon a careful consideration, shows, quite overwhelmingly, that the defendant exercised, at least, ordinary professional care; that it shows he was a qualified physician and by his professional service undertook and endeavored to do the best he could in giving her such treatment as seemed reasonably appropriate to her condition. Further, if we make the strongest inference favorable to the plaintiff, based almost solely on her own testimony, and conclude that she was burned, and seriously injured as a result thereof, it is still true, as the court in the *Sims* case, *supra,* says: "Proof of a bad result or of a mishap is of itself no evidence of negligence or lack of skill."

It is contended by counsel for the plaintiff, as a procedural matter, that the defendant is barred from presenting the questions sought to be reviewed because of his failure to file a motion for a new trial, in writing, in accordance with the order of the court.

The record shows that the verdict was rendered on June 19, 1919; that at once counsel for the defendant made a motion for a new trial; that on July 7, 1919, an order was entered, on motion of plaintiff's attorney, that defendant file a written motion for a new trial. It next shows that, on October 8, 1921, over two years later, that an order was entered reciting that the cause coming on to be heard on defendant's motion hereinbefore entered for a new trial, and after arguments of counsel and due deliberation of the court, said motion is overruled, and judgment entered. In our judgment, as the record shows that the motion was made and argued and passed upon, and no objec-

tion was made that it was not in writing, it is now too late to claim that the failure to file a written motion precludes this court from considering the errors assigned. In *Yarber v. Chicago & A. Ry. Co.*, 235 Ill. 589, in a learned opinion by Mr. Justice Dunn, the following language is used:

"The party moving for a new trial may be required by the court or the opposite party to file the points in writing, specifying the grounds of his motion. If this is not required and the motion is submitted without any statement in writing of the grounds therefor and without objection, the requirement of such statement is waived."

The judgment will be reversed with a finding of fact.

*Reversed with a finding of fact.*

THOMSON, P. J., and O'CONNOR, J., concur.

Finding of fact: We find as a fact that the evidence does not show a lack of ordinary care on the part of the defendant.