(No. 4546—

Ruby O'Neil, also known as Ruby Benson, Claimant, *vs.* State of Illinois, Respondent.

*Opinion filed January 12, 1954.*

I. J. Stagman, Attorney for Claimant.

Latham Castle, Attorney General; William H. Sumpter, Assistant Attorney General, for Respondent.

Wham, J.

This is a suit for damages in the amount of $2,500.00 growing out of alleged injuries to the person of claimant, while committed to the Elgin State Hospital for mental treatment during the month of April, 1946.

Claimant in her complaint alleges that on March 13, 1946 she was adjudged incompetent by order of the County Court of Cook County, and committed to the Elgin State Hospital. Subsequently she was paroled, and again recommitted on March 22, 1948 to the Chicago State Hospital. She alleges that during her confinement at the Elgin State Hospital she was subjected to electric shock treatments, during which treatments she received personal injuries consisting of a dislocated shoulder, injury to the right elbow joint, and fracture of the left arm. She further alleges that during her confinement to the Elgin State Hospital, and, in particular, during the month of April, 1946, certain experimental theraputics were indulged in without adequate scientific basis, and that during the process of such experimentation the injuries complained of were occasioned.

Respondent has filed no answer to the petition of claimant, and, by virtue of Rule 11 of the Court of Claims, is presumed to have filed a general denial to the allegations of the complaint.

Neither in the complaint, nor in the brief and argument filed by claimant is there any contention that agents of respondent were guilty of any act of

negligence proximately causing the injuries complained of. It is fundamental that there can be no recovery unless claimant was injured through an act of negligence proximately causing the injuries.

The only evidence offered on behalf of claimant, concerning the happening of the alleged injuries, is her own testimony. She testified that, when she entered the Elgin State Hospital on March 16, 1946, her right and left elbows, arms and shoulders were normal, and she had complete use of these members. Shortly after she entered the hospital, she received electric shock treatments inducing unconsciousness for a period of six weeks, and, after regaining consciousness, she immediately noticed she was unable to use her arms and elbow. She testified that X-Rays were taken of her arms, and that shortly thereafter she had a conversation with a lady doctor, who had assisted in treating her, in which conversation the lady doctor stated, ''I want to explain to you the condition of your arms. You will never be able to use them any more the way you used to.'' She testified that, after she was discharged from the hospital, she discovered a complete handicap of the free use of her arms, that her left arm was crooked, and that it was a strain to feed herself. She specifically testified that she did not know what took place during the time she was in the coma, nor what treatments were administered in that period.

Respondent's Departmental Report, submitted by D. Louis Steinberg, M.D., Superintendent of the Elgin State Hospital, stated that claimant was committed as mentally ill to the Elgin State Hospital from Cook County on March 16, 1946, and was received at the hospital on March 20, 1946. On March 23, 1946, because of claimant's acute psychotic mental condition,

electric shock therapy was instituted. Such Report further stated than an X-Ray examination on April 24, 1946, after the treatments were completed, revealed extensive calcification of the soft tissues in both shoulders with little arthritic changes noted, and also showed extensive calcification of the soft tissues, in the right elbow, while no arthritic changes were evident. X-Ray diagnosis reflected calcifying periarthritis of both shoulders and right elbow. The Departmental Report further stated that the shoulders were not dislocated, nor were any bones broken during the electric shock treatments, and that claimant was conditionally discharged to her husband on June 15, 1946, and absolutely discharged, as improved, on June 15, 1947. On March 22, 1948, the patient was committed to the Chicago State Hospital, and was admitted there on March 24, 1948.

A Report from the Psychopathic Hospital, dated March 24, 1948, stated that claimant sustained a spiral fracture of the left humerus, middle third, while being dressed for transportation to the State Hospital, and was treated for such by casting on March 22, 1948. The Departmental Report further stated that the patient was absolutely discharged from the Chicago State Hospital, as recovered, on January 8, 1951. On April 26, 1951, the patient was committed to the Chicago State Hospital, and was absolutely discharged, as recovered, on February 2, 1953. The Report stated the claimant sustained no injuries to any of her bones, while she was a patient at the Elgin State Hospital, and that she was not subjected to "certain experimental theraputics", as charged in the complaint.

The Report contained the following information with regard to the treatment rendered claimant: "Electric shock therapy was a standard form of treatment

in mental conditions such as patient exhibited. Upon her arrival here in 1946, patient was so acutely disturbed that her life was endangered from exhaustion. Her mental condition improved under electric shock treatment."

Medical testimony was offered by both claimant and respondent, and exhibits, consisting of various X-Rays, were also offered in evidence, which evidence we do not intend to discuss.

Assuming that the claimant was injured during the electric shock treatment, which we do not hold to be a fact by such assumption, the sole question then involved is whether or not the rule of res ipsa loquitur applies. It plainly appears from the pleadings, the evidence, and the brief and argument of claimant, that no specific act of negligence is either averred, proved or asserted. Although claimant makes no specific mention of the doctrine, she is, in effect, relying upon it in this case.

Res ipsa loquitur is a form of circumstantial evidence creating an inference of negligence, which may be utilized by claimant in establishing a prima facie case. As stated by the Supreme Court of Illinois in *Chicago Union Traction Co.* vs. *Giese*, 229 Ill. 260, "the circumstances surrounding a case where the maxim res ipsa loquitur applies amount to evidence from which the fact negligence may be found."

In order for such doctrine to be available to a claimant, it is well established generally, and, in Illinois specifically, that the injury must have been caused by a thing in the exclusive control or management of the defendant, and, further, that the accident must be such as in the ordinary course of events will not happen, if

those who have such control and management use proper care.

The case of *Bollenbach* vs. *Bloomenthal*, 341 Ill. 539, recognizes this principle, and is the leading case involving an attempt on the part of a plaintiff to apply the doctrine of res ipsa loquitur in a case wherein a dentist was charged with malpractice resulting in injury to his patient. The Court in denying the application of such doctrine quoted from one of the leading cases in the country, *Ewing* vs. *Good*, 78 F. 442, which opinion was rendered by Chief Justice Taft, then sitting in the United States Circuit Court of Appeals. In that case plaintiff sued a physician to recover damages for an alleged improper treatment of her eyes; her claim being that for his lack of proper care and skill she lost the sight of one eye, and part of the sight of the other. In holding there could be no recovery, Mr. Justice Taft said:

"The naked facts that the defendant performed operations upon her eye, that pain followed, and that subsequently the eye was in such bad condition that it had to be extracted, established neither the neglect and unskillfulness of the treatment nor the causal connection between it and the unfortunate event herein. A physician is not a warrantor of cures. If the maxim res ipsa loquitur were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the ills that flesh is heir to."

The Court in the Bollenbach case recognized the principle concerning the non-application of the doctrine of res ipsa loquitur previously set forth in *Chicago & Eastern Illinois Railroad Company* vs. *Reilly*, 212 Ill. 506, that "Where a condition can be accounted for as readily on the hypothesis of pure accident and absence of negligence as upon the ground of negligence, the rule is well settled that proof of an injury is not, of itself, proof of negligence where nothing is done out of

the usual course of business, unless that course of itself is improper."

This same doctrine is clearly stated in the case of *Kraus* vs. *Becker, Ryan & Company*, 265 Ill. App. 525, where the Appellate Court, in denying the application of the doctrine of res ipsa loquitur, stated at pages 532 and 533:

"The reason for the rule rests upon the presumption that in view of the surrounding circumstances the accident would not have happened had the defendant used ordinary care, and therefore, when the surrounding circumstances leave room for a different presumption, the reason for the rule fails. *McGowan* vs. *Nelson*, 36 Mont. 67.

In well considered cases resting upon the application of the doctrine of res ipsa loquitur, as tending to establish prima facie evidence, and where liability was upheld, it will be invariably found that in every instance there was an essential element present, that is proof of the existence of the cause or thing, which was alleged to have been the negligent act, which produced the injury, or proof of such facts from which the existence of such cause or thing constituting the alleged negligent act was the only reasonable inference that could be properly drawn. *Conover* vs. *Delaware, G. & W. R. Co.*, 92 N.J.L. 602."

Generally speaking, it is the law in Illinois, and generally throughout the country, that in a malpractice action the doctrine of res ipsa loquitur is not applicable, but the plaintiff, in order to recover, must offer affirmative evidence; and, as a general rule, expert testimony to show that the bad result or injury was caused by an alleged unskillful or negligent act. To that effect see *Olander* vs. *Johnson*, 258 Ill. App. 89, wherein it is stated at page 96:

"Before a plaintiff can recover in a malpractice case, it must be shown by affirmative evidence, first, that defendant was unskillful and negligent, and second, that his want of skill and care caused injury to the plaintiff. If either element is lacking in the proof, no case is presented for the consideration of a jury. (*Ewing* vs. *Goode*, 78 Fed. 442; *Moline* vs. *Christie*, 180 Ill. App. 334; *Wallace* vs. *Yudelson*, 244 Ill. App. 320; *Sims* vs. *Parker*, 41 Ill. App. 284; *McKee* vs. *Allen*, supra; *Phebus* vs. *Mather*, 181 Ill. App. 274; *Graiziger* vs. *Henssler*, 229 Ill. App. 365.)

Mere conjecture or supposition should not be sufficient to overcome the presumption in favor of the attending physician. Alleged negligence and resulting injury must be proved as averred. A physician is not an insurer. (*Goodman* vs.

*Bigler,* supra; *Sims* vs. *Parker,* supra; *Blodgett* vs. *Nevius,* 189 Ill. App. 544; *Wallace* vs. *Yudelson,* supra; *Graiziger* vs. *Henssler,* supra.) Proof of a bad result or of a mishap is of itself no evidence of negligence or lack of skill. (*Sims* vs. *Parker,* supra; *Moline* vs. *Christie,* supra; *Blodgett* vs. *Nevius,* supra.)

The doctrine of res ipsa loquitur is not applicable to situations like the case at bar (*Guell* vs. *Tenney,* 262 Mass. 54, 159 N. W. 451; *Funk* vs. *Bonham* (Ind. App.), 151 N. E. 22; *Goodman* vs. *Bigler,* supra; *Graiziger* vs. *Henssler,* supra), for unless the accident or injury sustained by the plaintiff bespeaks the defendant's wrong, there is no proof of culpable negligence. (*Chicago & E. I. R. Co.* vs. *Reilly,* 212 Ill. 506.)

As a general rule, there must be expert testimony to show that a bad result was caused by the alleged unskillful or negligent act. (*Moline* vs. *Christie,* supra; *Goodman* vs. *Bigler,* supra; *Kruger* vs. *McGaughey,* 149 Ill. App. 440; *Nelson* vs. *Sandell,* 202 Iowa 109, 209 N. W. 440; 46 A.L.R. 1447.)"

To the same effect see *Bollenbach* vs. *Bloomenthal,* 341 Ill. 539; *Graiziger* vs. *Henssler,* 229 Ill. App. 365; and *Goodman* vs. *Bigler,* 133 Ill. App. 301.

There are, however, certain cases within the malpractice classification in which the doctrine of res ipsa loquitur is applicable. In the case of *Johnson* vs. *Marshall,* 241 Ill. App. 80, the Appellate Court of the Second District in Illinois held in a case where a physician was being sued by a patient for negligently treating him by X-Ray, resulting in burns to the plaintiff's face, that under the facts involved therein the doctrine of res ipsa loquitur could be invoked, inasmuch as that particular occurrence was such as in the ordinary course of events does not happen, if due care had been exercised. At page 91 the Court stated:

"When the fact that plaintiff was burned severely is taken in connection with the assurance given by the defendant to the plaintiff that it would not hurt him and with the testimony of Dr. Irvin which tends to prove that the X-Ray machine with ordinary skill will not burn a patient, at a point other than intended, we think the testimony fairly tends to show that plaintiff was burned because of a lack of ordinary care in the operation of the machine. The showing made, notwithstanding the rule contended for by the defendant in malpractice cases, is sufficient in our opinion to authorize the submission of the question of fact to the jury for them to determine whether or not the defendant was guilty of the negligence alleged in the declaration or some count thereof."

Whether the maximum of res ipsa loquitur applies in the present case, or any given case, is a question of law for the court to determine from the facts involved. *McCleod* vs. *Nel-Co. Corp.*, 350 Ill. App. 216 at 235; *Roberts* vs. *Economy Cabs, Inc.*, 285 Ill. App. 424 at 428 and 429.

We must, therefore, in order to determine whether the doctrine applies in this case, make this inquiry: Do the facts and circumstances show that the alleged injury to claimant would not have happened in the ordinary course of events had the defendant used ordinary care in conducting the electric shock therapy treatment? And, more specifically, is the treatment of such nature that the only reasonable inference to be drawn from the occurrence of injury during treatment was that the treatment was improperly and negligently conducted?

The question can only be determined from a knowledge of the electric shock therapy treatment itself. This particular question has not been before the Illinois courts, and, due to the relatively recent development of such treatment, has arisen in only two cases in the United States that we have been able to find.

The first case before any court of review was the case of *Quinley* vs. *Cocke, Et Al*, Supreme Court of Tennessee, 192 S. W. (2d) 992, decided on March 2, 1946. In that case Dr. E. W. Cocke and Gartley Ramsey Hospital of Memphis were charged in the complaint with general negligence resulting in the fracture of plaintiff's hip and thigh during a certain electric shock treatment for plaintiff's nervous disorders, and first discovered by plaintiff upon regaining consciousness. His complaint was based upon the doctrine of res ipsa loquitur, and the trial court directed

a verdict for both defendants. Plaintiff appealed as to the defendant, Dr. Cocke, to the Circuit Court of Appeals, which court affirmed the trial court, and plaintiff further appealed to the Supreme Court of Tennessee. The sole question raised on appeal was whether or not the rule of res ipsa loquitur applied. The court discussed the method of electric shock therapy treatment, which is one of a most violent nature, at page 994:

"While the treatment is being given the patient is lying down on a treatment pad with his head in a downward position. A certain amount of electric current is caused to pass through the head and body as a result of which the patient becomes unconscious and remains so for several hours . . . . Evidently they hold the patient, due to the fact that he is having violent convulsions."

At page 997, the court summarized certain scientific journals filed with the record in the case, and dealing with electric shock therapy and personality disorders, to-wit, the American Journal of Psychiatry, the Pennsylvania Medical Journal, the American Journal of Medical Sciences, and the Journal of the American Medical Association, and stated that:

"While these periodicals minimize to a certain extent the danger of fractures to the spine and other bones, the fact is fully established that, as a result of violent convulsions caused by this treatment, they sometimes do occur when the treatment is properly given."

All of which the court stated was supported and confirmed by the testimony of an expert witness to the effect that, "Such fractures occur while the shock treatment is being given 'even with every precaution to prevent them' ".

In summarizing the case, the court said at pages 96 and 97:

"Now in the instant case the plaintiff introduced no evidence showing a lack of skill in administering the shock treatment, that he was given an excessive shock of electricity, or for an unusual length of time. There is no evidence to show that

the treatment given differed in any way from that which is usual and customary of a skilled practitioner in a situation of this kind, there is manifest need of a 'scientific exposition of the subject matter' for the court and jury to clearly understand the nature of the treatment, as well as the usual results that follow. The treatment is something new in medical science. It originated in Italy in 1938, and was first practiced in the United States in 1939 or 1940. Due to its very recent origin all knowledge of the scientific application of the principle is necessarily limited to only a few experts."

The court, in refusing to apply the doctrine of res ipsa loquitur, stated at page 997:

"In order to warrant the application of the doctrine in the instant case, the court would have to take judicial notice that, as a matter of common knowledge and experience, fractures of the spine and other bones do not occur as the result of 'shock therapy' in the absence of negligence. This we cannot do."

In deciding this case, the court stated that ordinarily the doctrine of res ipsa loquitur is inapplicable in malpractice cases, although it recognized exceptions to this general rule in cases such as X-Ray burns, etc., where "there is manifest such obvious gross want of care and skill as to afford of itself an almost conclusive inference of negligence". The Court then stated that, however, "the rule will not apply in malpractice cases 'where scientific exposition of the subject matter is essential' ". *Shain's Res Ipsa Loquitur*, pages 468, 469 and 470.

The next case involving this question was *Farber* vs. *Olkon*, 246 P. (2d) 710, District Court of Appeals, Second District, Division 2, California, decided on July 25, 1952, which case involved an action by George Farber, an incompetent person, by Joshua Farber, guardian of his person and estate, against David M. Olkon, Et Al, doing business as Los Angeles Neurological Institute. The complaint in that case, as in the Tennessee case, charged general negligence against the defendants in the administering of the electric shock therapy treatment to plaintiff, resulting in both legs

being fractured during treatment. The trial court directed a verdict in favor of the defendants, which action was sustained by the District Court of Appeals. The court at page 715 said:

"The law of this State is that generally the plaintiff in malpractice litigation must prove the negligence of the physician by expert proof .... Negligence on the part of the physician is not presumed, but must be affirmatively shown."

The court stated that those decisions, in which the doctrine of res ipsa loquitur has been invoked, are situations, "where a layman is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed, if due care had been exercised".

The court then cites the *Quinley* vs. *Cocke* case, supra, stating at page 715 that:

"The court there rejected the doctrine of res ipsa loquitur. So, in deed the court below (the trial court) in the case at bar did likewise and properly so. The machine of respondent was not defective. The convulsion was the indispensable element of the treatment. If it did not affect violently all parts of the body, it would bring no soothing effects to the mind of one in George's condition. The trial judge accurately observed: 'The injury, the evidence shows, was foreseeable, and its possibility was a calculated risk ... Whether or not fractures of the bones are accepted hazards of electro convulsive therapy, whether or not they occur even though all standards of procedures of good practice are observed, the manner in which such treatments are given, their purposes and their effects, what is likely or unlikely to happen in the course of their administration, what is the usual and what is the unusual consequence, and the mental and physical effect of the treatment are not matters of common knowledge with which laymen are familiar. To know about them, to evaluate them, to say whether ordinary fractures would not occur in the absence of negligence, we require the opinion of experts.' "

The above case was then appealed to the Supreme Court of California, and affirmed on March 17, 1953, said case being reported in 254 P. (2d) 520.

The Supreme Court commented extensively upon the testimony offered concerning the nature of the treatment at page 525:

"The undisputed testimony of both defendant, Dr. Wayne, and witness, Dr. Thompson, in the instant case establish that electro shock treatment is designed to have an effect upon the entire body. The entire body is actually thrown into a convulsive state, and the aim and hope, of course, is that this convulsion and all of the biochemical changes that occur with this type of convulsion will produce a helpful and beneficial effect upon the patient's mental condition; that the most frequent, most normal and most common hazard, which is germane, which is inherent in the method of treatment is fractures. There are certain other hazards, and, in deed, there are some cases in which death has actually resulted directly from the hazard germane to the treatment, but these are calculated risks of the treatment. . . Fractures occur as the result of muscle tension, whether it is in shock treatment or stepping off of a curb. . . And in treatment there is muscle tension which is a part of the treatment, and, therefore, . . . fracture becomes a calculated and even an expected risk of the treatment. . . . There is a certain percentage of fractures which occur not withstanding any kind of precaution or care that can be taken to prevent it. . . . The area of fracture is completely unpredictable. The overall instance of fractures in shock treatment varies anywhere from perhaps one and a half to about three and a half per cent. If one considers fractures of the spine. . . the incidence is between ten and forty percent.

The Supreme Court directly affirmed the trial court's holdings stating:

"The trial court correctly concluded that the opinions of experts are required to evaluate the proceedings and hazards of shock therapy in any particular case. . . . And that the evidence does not 'show any combination of facts and expert opinion from which a layman can draw the inference that the consequences of the treatment administered to plaintiff were not such as ordinarily, that is, normally, may follow if due care has been exercised'."

The court then stated: "accordingly no basis for invoking the doctrine of res ipsa loquitur was established", and cites the case of *Quinley* vs. *Cocke*, 183 Tenn. 428, 192 S. W. (2d) 992.

The Supreme Court further recognized the rule, which we believe should apply in determining whether or not facts concerning the nature of a certain kind of treatment place that treatment in such a category that the doctrine of res ipsa loquitur will apply in the event of injury, and stated at page 524:

"It further appears that the doctrine of res ipsa loquitur may not be invoked by plaintiff. The doctrine applies in medical malpractice cases only where a layman is able to say, as a matter of common knowledge, and observation; or from the

evidence can draw an inference that the consequences of professional treatment were not such as ordinarily should have followed if due care had been exercised."

We feel that the above decisions of the Tennessee and California courts, and the principles announced therein, are sound, and should be followed in the present case. The evidence herein established that the electric shock treatment, administered at the Elgin State Hospital to claimant, Ruby O'Neil, was a standard form of treatment used in such cases. There is no evidence to the effect that fractures do not occur in the ordinary course of events during the proper administration of such treatment. There is no evidence that the treatment is of such a nature that fractures occurring therein constitute a reasonable inference of neglect or improper conduct.

The burden of establishing facts to justify such an inference must be borne by claimant in order to invoke the doctrine of res ipsa loquitur, unless such facts are sufficiently within the common knowledge, observation and experience of men to allow the court to take judicial notice of them. For this Court to take such judicial notice would be not only to disregard the lack of common knowledge, observation and experience of men concerning this type of treatment, but also to ignore the recorded views of the highest courts of two States, which have had the benefit of expert testimony and scientific medical journals in reaching its conclusions. It is our holding that the doctrine of res ipsa loquitur could not be invoked in a suit against the doctor, and other persons individually, who rendered the treatment to claimant, and, therefore, cannot be invoked in this suit against the State of Illinois.

To hold otherwise, would be to ignore, in our judgment, the fundamental requirement, so clearly

recognized by the Illinois courts, namely, that the doctrine of res ipsa loquitur may only be applied when the accident is of such a character as in the ordinary course of events will not happen, if those who have management and control of the thing causing the injury use proper care. To obliterate this requirement, would completely change the entire concept upon which the doctrine of res ipsa loquitur is based.

It is further to be noted that when claimant was subjected to these treatments, she was "so acutely disturbed that her life was endangered from exhaustion", and that her mental condition was improved by reason of the treatment. It would, in our judgment, be bad policy to hold that the doctrine of res ipsa loquitur applies in such a case. To do so would certainly have a deterring effect upon members of the medical profession in making use of this and similar methods of treatment for the fear of being subject to malpractice actions, and compelled to meet the presumption or inference of negligence with affirmative testimony years after such treatment was rendered. If such were the case, "few would be courageous enough to practice the healing art", *Ewing* vs. *Good*, 78 F. 442 at 443, and the forward development of new methods of treatment would be discouraged.

There being no evidence of negligence proximately causing the alleged injuries of claimant, and for the reasons hereinabove set forth, this claim is denied.