Henry Olson, Appellee, v. Harry B. North, Appellant.

Gen. No. 8,758.

460

Opinion filed August 24, 1934.

Roy H. Brown and David D. Madden, for appellant.

Frank E. Maynard, for appellee.

Mr. Presiding Justice Wolfe delivered the opinion of the court.

An action on the case was instituted by plaintiff against defendant in the circuit court of Winnebago county to recover damages for the alleged failure of defendant to use reasonable care and skill in the defense of plaintiff under an indictment for murder.

A demurrer was sustained to the original declaration. Thereafter the plaintiff filed an amended declaration, consisting of two counts, to which the defendant filed a demurrer, general and special. The demurrer was sustained, and, the plaintiff electing to abide his declaration, judgment was rendered against him in bar of his action and for costs. To reverse said judgment, an appeal was prosecuted to this court. *Olson v. North* (Abst.), 266 Ill. App. 621.

For convenience we will refer to the appellant as the defendant and to the appellee as the plaintiff. The first count of the declaration sets forth that on September 6, 1927, one Floyd Stotler was murdered, and on September 13, plaintiff was arrested, charged with said murder; that on said day he employed the defendant as his attorney to conduct his defense; that defendant had been engaged in the practice of law in the City of Rockford for 25 years, and for 12 years of said time he was State's attorney and had tried a large number of criminal cases; that he represented himself to be "especially qualified in the defense of criminal cases, including murder cases"; that during the progress of said trial plaintiff paid to defendant $4,250 as attorney's fees; that it became the duty of defendant to properly prepare and "in a reasonably skillful, careful and proper manner" to try said cause; that plaintiff informed defendant that he was not guilty of said crime; that at the time Stotler was murdered plaintiff was residing with his parents at 1318 Kishwaukee street in said city. Said count in detail sets forth the whereabouts of plaintiff and what he was doing from 3 o'clock in the afternoon of said day until 1:30 the next morning, when he learned of said homicide; that plaintiff advised defendant as to all of said facts and circumstances, which were in part claimed to be corroborated by one James L. Donnett, a bus driver, who saw plaintiff about 9 o'clock on the evening in question; that plaintiff was tried on two different occasions; that on the first trial the jury disagreed; that on the second trial the jury found plaintiff guilty; that defendant failed and refused to use the father and mother of plaintiff and said bus driver as witnesses in proof of the alibi claimed by him; that the only evidence offered by defendant on behalf of plaintiff on the second trial was plaintiff's own testimony, defendant having placed him on the stand "and asked him only his name, address, and whether or not he had

killed Floyd Stotler, to which latter question plaintiff replied 'no' ''; that on the first trial plaintiff's father and mother and said bus driver testified in support of said alibi; that after plaintiff had been arrested and had employed defendant, one George Bliss and one Maurice Mahan were arrested for carrying concealed weapons, and employed defendant to represent them; ''that the gun found concealed on the person of the said George Bliss was a gun of the same caliber, bore and description and was loaded with and shot the same kind of bullets as the gun which killed the said Stotler, and as were found in the body of Stotler''; that defendant was present in the county court as the attorney of Bliss and Mahan when they were sentenced; that the county judge stated in open court that the gun taken from Bliss ''was of the same kind, character and caliber as the gun used in the killing of Floyd Stotler''; that plaintiff requested defendant to investigate as to whether the gun found concealed on the person of Bliss was the gun from which the bullets were fired that killed Stotler, but that defendant failed and refused to make such investigation.

Said count further avers that at the hour and time of the murder of Floyd Stotler, plaintiff's father and mother were at their home at number 1318 Kishwaukee street aforesaid, where plaintiff and his wife were also residing at that time, and where the plaintiff was at the hour and time of the murder of Floyd Stotler, and that the testimony of plaintiff's father, Emanuel Olson, was material and necessary to establish the alibi of the plaintiff in the second trial of the plaintiff, Henry Olson, for the murder of Floyd Stotler, and that the said defendant, Harry B. North, knew and fully understood that Emanuel Olson, plaintiff's father, could testify that plaintiff was at his home aforesaid, at the hour and time of the murder of Floyd Stotler, and yet, the said defendant, Harry B. North, failed and

refused to put the said Emanuel Olson on the witness stand in the second trial of plaintiff for the murder of Floyd Stotler. The same averment is made with reference to Sarah Olson, the mother of plaintiff.

Said count further charges that Orville Stotler, the father of Floyd Stotler, who was an eyewitness to said homicide, testified that the bandit who shot and killed his son, Floyd Stotler, in his presence, was the same size and height as his own son; that the said Floyd Stotler was approximately five feet and 10 inches tall and weighed approximately 180 pounds, while the plaintiff was a man of slight build and frame and only five feet seven and three-quarters inches tall; that plaintiff requested defendant to investigate such matter but he refused so to do; that plaintiff also heard the father of said Floyd Stotler testify that the bandit who shot and killed his son had had a recent haircut and was clean shaven and that he had a high haircut; that he, plaintiff, had not had his hair cut for more than five weeks; that his hair was shaggy and unkempt and did not look like a high haircut; that he asked defendant to investigate into these facts and that he failed and refused so to do; that prior to the second trial of said cause plaintiff informed defendant that he had been informed that several suspects had been taken in by the police department of the City of Rockford and examined as to their connection with the murder of Stotler, and each of them had had fingerprints made of their hands and that there were fingerprints found on a door of an automobile like the automobile in which the bandits came to the murder; that plaintiff's fingerprints had not been taken and that he desired to have them taken and compared with such prints, but that defendant refused to make any investigation or to have plaintiff's fingerprints taken; that defendant cross-examined Orville Stotler, the father of said deceased, for two and a half days; that such

examination was unskilfully done, and was of a character to humiliate said witness and to prejudice the jury against plaintiff on account thereof; that on account of the foregoing matters plaintiff was found guilty at the second trial of said cause; that the circuit court released plaintiff on his own recognizance; that he, plaintiff, was panic stricken and fled from the jurisdiction of the court and that no one in or about the county of Winnebago knew his whereabouts; that thereafter plaintiff procured the services of another attorney, who obtained an admission of guilt from the said Bliss and Mahan "and then and there the said Harry B. North disclosed for the first time that George Bliss and Maurice Mahan were in fact the guilty parties who had murdered Floyd Stotler"; that said parties were arrested, charged with said crime and pleaded guilty to said charge.

Said count further avers that during all the time of said employment plaintiff had kept good faith with defendant, but that the defendant had negligently, carelessly, improperly, indifferently and unskilfully failed and refused to perform his duty and to use ordinary care, caution and prudence in preparing said defense, alleging damages, etc.

The second count, in addition to certain of the averments of first count, avers that "the said Harry B. North, defendant, at the time of the trial of said murder case, well knew that the gun carried by George Bliss was the gun that had been used in the murder of Floyd Stotler, and that the bullets in the body of Floyd Stotler were bullets that had come from the gun carried by George Bliss as aforesaid, and that in order to protect his then clients, George Bliss and Maurice Mahan, the said Harry B. North wrongfully, wickedly and intentionally failed and refused to examine into the question by hiring an expert to examine said guns and bullets," etc. Said count further charges that after plaintiff had been convicted on said

second trial and had absconded, "the said Harry B. North, defendant, in order to relieve and help clarify the situation, disclosed the fact that George Bliss and Maurice Mahan were the guilty parties who had killed and murdered Floyd Stotler''; that defendant "during all of said time, wrongfully, maliciously and intentionally continued to represent George Bliss and Maurice Mahan until after the second trial of the plaintiff, Henry Olson, and until after plaintiff had been found guilty of the murder of Floyd Stotler, as aforesaid, and continued to accept and take large fees from the plaintiff for services in defending him, the said Henry Olson, plaintiff, as aforesaid, in the said criminal case to the amount of $4,250, and that in addition to the said $4,250, the said plaintiff expended and paid out to Harry B. North and others for investigating the matter and hiring detectives other large sums of money, amounting altogether to nearly the sum of $7,000," etc.

In our former opinion we held that this declaration stated a good cause of action. The case was reversed and remanded to the circuit court of Winnebago county, and after the case was reinstated and redocketed in the circuit court of that county, the defendant filed a plea of the general issue. The case came on for trial before a jury with the Honorable William J. Fulton of Sycamore, Illinois, presiding in said court. The plaintiff introduced evidence to sustain the charges in the declaration and rested his case. The defendant filed a motion for a directed verdict claiming that the plaintiff had not proven a cause of action. This motion was overruled by the court. The defendant then presented his evidence, and the plaintiff introduced evidence in rebuttal. At the close of all of the evidence the defendant again moved for a directed verdict. This motion was also denied and the case was submitted to the jury. A special interrogatory was submitted to the jury, which they answered in the

affirmative. The jury, by their general verdict, found the defendant guilty and fixed the plaintiff's damage at $29,250. The defendant filed a motion for a new trial which the court overruled. He also filed a motion in arrest of judgment which the court overruled. The court advised counsel for the plaintiff that unless a remittitur from the verdict in the sum of $21,750 was agreed to, a new trial would be granted in the case. The plaintiff by and through his counsel, then and there, entered a remittitur in the sum of $21,750 from said verdict returned by the jury in the case. To the entering of a judgment for $7,500 in favor of the plaintiff the defendant brings this case to this court on appeal.

The plaintiff in his printed brief in discussing the charges against the defendant says: ''The amended declaration consisted of two counts. The first count charges negligence and carelessness in the preparation of plaintiff's case and the actual trial of the plaintiff's case by the defendant. The second count in addition to the averments in the first count charges the defendant, North, with wrongful, malicious and intentional misconduct in the performance of his duty toward his client plaintiff, Olson; that he accepted employment from Olson and charged him $4,250 for his services and at the time accepted employment by Bliss and Mahan, who were charged with carrying concealed weapons in another criminal case pending in the county court; that North learned and knew from Bliss and others that Bliss, whom he was representing in an appeal from the county court decision, was the guilty party who shot and killed Stotler, for which murder his client, Olson, was indicted, and on being tried he failed and refused to divulge that fact to Olson, but continued to ask him for and took money from him (Olson), to represent him.''

The specific charges of negligence are the failure of the defendant to call James L. Donnett, a bus driver,

as a witness on the second trial in support of an alibi for the plaintiff; the failure to ask plaintiff questions while on the witness stand to prove his alibi; also the failure to call Emanuel Olson, the father of the witness, on the second trial in support of an alibi; and a failure to make an investigation of the kind and caliber of guns shooting bullets found in the body of Floyd Stotler, deceased, and the failure to hire and employ an expert on guns and bullets to determine if the gun found on George Bliss at the time he was arrested and being tried in the county court was the gun that fired the bullets into the body of Floyd Stotler and killed him; the failure to provide an interpreter for the witness, Sarah Olson, the mother of the plaintiff, who could not speak the English language fluently; the failure to show by the insurance policies on the life of Floyd Stotler and the failure to exhume the body of Floyd Stotler to prove the height and weight of the murderer; the failure to show that the plaintiff, Henry Olson, had not had a haircut for more than five weeks; the failure to have Bliss's fingerprints taken by the police department for the purpose of comparing them with the fingerprints on the door of the automobile which was supposed to have been used by the murderers when they shot Floyd Stotler. The defendant cross-examined Orville Stotler, the father of Floyd Stotler, deceased, for practically two and one-half days. This they claim was negligence on the part of the defendant and had a bad effect on the jury and was one of the reasons that caused the conviction of Henry Olson of the crime of murder.

The plaintiff testified in detail as to all of these charges of negligence on the part of Mr. North in the conduct of his trial. The defendant in his testimony explained all of these charges summarized as follows: Defendant advised plaintiff that Orville Stotler was the only eyewitness to the murder; that the newspapers had inflamed the people against plaintiff and

that plaintiff would have to meet the testimony of Stotler and to build a record so that a conviction could not stand against him; that with the impounding order and breaking down the identification by Stotler, under the law, the people could not prove its case beyond a reasonable doubt, and that he should take no chances of getting away from the main issue and should keep the prosecution right to that point; that there was nothing in the record as to identification except the self-asserted declaration of Mr. Stotler which took place in the court room.

Plaintiff stated that some people had been saying that he ought to have his fingerprints taken and hand them to the police, saying that there must have been fingerprints on the automobile; that everybody that was around the car had left fingerprints there. Plaintiff was advised that he did not have to prove that he was not guilty, but the State's attorney must prove that he was guilty, and that if he had his fingerprints taken, it would go through the State's attorney's office, then to the police, and the newspapers would take it up and ridicule it, and that it was not wise to keep inflaming the people against him because Stotler and the newspapers had the people believing that he was guilty, and that if somebody should then come in and testify that they found some fingerprints that looked like his, that would be a circumstance against him; that if the people had nothing more than the one identification weakened by impeaching evidence, that identification would not satisfy the law as to guilt. Defendant, on inquiry, was informed that no fingerprints had been taken from the automobile or from anything else.

Defendant advised plaintiff not to go into the question of his hair not having been cut for four or five weeks, because some police officer might come in and say that he saw him that night at 1:30 and that he had a recent haircut, and that defendant could not say

whether the police were going to say that or not and that he would not like to take the chance; that we should make the defense on the weak identification by Stotler and stay by it.

Henry Olson wore glasses and suggested that the question be asked of Stotler whether or not the murderer wore glasses. Defendant advised not to do that on the possibility that Stotler might act on the suggestion and testify that the man did have glasses. Plaintiff said he could not see to drive at night because he was nearsighted. Defendant reminded him that Stotler did not testify as to which one of the men drove the machine, and that he should not discuss the question of glasses one way or the other, on any question.

Defendant advised that witness, Donnett, be not placed on the stand in the second trial in support of the alibi. Defendant told plaintiff that Donnett had made a very bad impression on the first trial; that he seemed to be confused and upon his going back on the witness stand he only made it worse; that Mr. Pierce, the assistant State's attorney, would present a transcript of the evidence on the first trial, where Donnett had stated that he had changed his evidence, and in that way Mr. Pierce would impeach him, and that in the judgment of defendant, it would do damage; that he could cover this alibi without opening that testimony to the very accurate and searching examination by Mr. Pierce, and that it would eliminate the arguments that Mr. Pierce would make to the jury about it; that Pierce had made a very clever argument against him on the first trial and that we should not open that chance again with that same witness.

Defendant advised against placing Emanuel Olson on the stand in the second trial in support of the alibi, for Emanuel Olson on the first trial, had testified minutely as to all of the movements by Henry and his wife, going to the bus, coming to the porch, undress-

ing, going to bed, and that Pierce had made much out of this on the first trial, and that they should not offer him the same chance again to put the same witness on and let him ridicule him and pick him to pieces and distract the jury's attention from the main issues in the case; also for the reason that the only way his father could have known of these things was by being told by others; that the evidence in the first trial shows that Emanuel Olson had been in the habit of going to bed at 8:30, sleeping in the basement, but that night he did not go to sleep; that he knew certain things were happening and fixed the time by pulling on the light, looking at his watch and turning the light out again; that Mr. Pierce had made fun of the old man on the first trial and that it diverted the jury's attention, and that Mr. Pierce had not stood by the challenge put to him on the identification issue, but had distracted the mind of the jury on to another issue; that the jury disagreed because they could not make 12 men believe plaintiff's alibi; that they did not believe it because of those very discrepancies in the father's testimony.

Defendant advised plaintiff not to testify in detail as to his alibi, as he had on the first trial, saying that he had an automobile; that he had not worked for two years; that he was using money to buy and sell stocks on the market; that he had a deposit with an agent in Chicago, for defendant had information since the first trial that the State's attorney's office had procured a copy of his accounts and figures pertaining to his money, and were ready if plaintiff opened up that subject, to show that the last few days prior to the murder, he, plaintiff, was losing money. He advised that the fact that his wife was working at Burson's and that he, plaintiff, was not working, would be the basis of a legitimate argument, that he had a motive to steal and to go out and hold up people. Defendant further

advised plaintiff to take the witness stand and testify as to the size of his hat, his weight and height, and that he did not commit the murder and knew nothing about it; that Mr. Pierce would likely cross-examine him, and if he should, that plaintiff should answer all questions; and that his alibi would be covered by alibi witnesses who had not been impeached and who would not give Mr. Pierce a chance to ridicule this defense.

Defendant also told plaintiff that the United States Government reports showed that 1.10 inches of rain had fallen on the day of the murder; that plaintiff, at the first trial, testified he had been sprinkling the lawn, and that if they should bring those weather reports in, that again they were putting an issue to the jury which would divert their attention to the question of whether it had rained or not at his home that day. Defendant advised plaintiff not to make the same mistake twice, but to be sure to have a record that would impeach witness, Stotler.

Plaintiff called defendant's attention to the fact that a newspaper article had been published stating that Judge Carpenter, when sentencing Mahan and Bliss to Vandalia, for carrying concealed weapons, had made a remark to the effect that the gun then in court might be like the one that killed Floyd Stotler, and plaintiff suggested that a gun expert be called to examine the bullets to determine whether they were fired from the gun found on Bliss and Mahan. Defendant made inquiry of officer Ott, who arrested Bliss and Mahan; and of Robert E. Nash, assistant State's attorney, and learned that Orville Stotler had examined Bliss and Mahan for identification and had advised the State's attorney they were not the ones who did the shooting, and that the barrels of the guns that killed Floyd Stotler were octagonal and that the guns found on Bliss and Mahan were round-barreled. Defendant told Henry Olson of this interview and told

plaintiff that in attempting to use a gun expert, he was undertaking to prove the guilt of someone else and that this would find its way to the public press and might react against him.

Plaintiff suggested exhuming the body of Floyd Stotler so that they could measure it and determine its height and weight, because Stotler had identified the murderer as a man similar in size and weight to his dead son. Defendant advised plaintiff that he had no power to do this; that it would be a gruesome thing to do and in the face of public opinion, it would look like they were desperate; that the doctor's evidence or the coroner's evidence had made some showing as to the approximate size of the body of Floyd Stotler.

Plaintiff told defendant that he was afraid that defendant was cross-examining Orville Stotler, the father of the deceased Floyd Stotler so long that it was making the jury tired and that it would hurt his case. Defendant told plaintiff that the people were against him; that the jury was aware of that fact and that it was defendant's business to make a complete analysis of the evidence, finish the cross-examination in such a manner that when he was through, the identification could not stand up.

There is no question about many of the facts in this case, namely: that Floyd Stotler was murdered on the night in question is not disputed; that the plaintiff was charged with the murder shortly thereafter and confined in jail; that he sent for Mr. Harry North, an attorney of that county to represent him; that Mr. North went to see the plaintiff and assumed the defense of Olson charged with the crime of murder; that he conducted the first trial which ended with a hung jury; that he conducted the second trial which resulted in finding the plaintiff guilty of the murder of Floyd Stotler; that later George Bliss confessed

to the murder, and on his plea of guilty was sentenced to the penitentiary and is now confined in that institution at Joliet, Illinois.

There is some dispute relative to the conversation between the plaintiff and the defendant at the time Mr. North was employed to defend Olson on this charge of murder. It seems to us that the substance of that conversation is immaterial, since it is undisputed that Mr. North accepted the employment to defend Olson on this charge of murder and when he accepted such employment the law cast upon him certain duties and obligations. We quote from our former opinion in this case: "When a person adopts the profession of law, if he assumes to exercise the duties in behalf of another for hire and reward, he must be held to employ in his undertaking a reasonable degree of care and skill. If injury result to the client from the want of such a degree of reasonable care and skill, he must respond in damages to the extent of the injuries sustained. It is the duty of an attorney to bring to the conduct of his client's business the ordinary legal knowledge and skill common to members of the legal profession, to act toward his client with the most scrupulous good faith and fidelity, and to exercise in the course of his employment that reasonable care and diligence which is usually exercised by lawyers."

The question then arises whether Mr. North in the second trial of the case of *People v. Olson,* charged with murder, exercised that degree of care and skill and good faith as required of him by law. The defendant seriously insists that the trial court erred in not directing a verdict in his favor as to the first count of the declaration at the close of the plaintiff's case because there was no expert testimony to show that he did not exercise that degree of care and skill in the defense of Olson as used by other skilful and reputable lawyers in such cases. The plaintiff replies that the

doctrine of *res ipsa loquitur* applies in this case. The meaning of this maxim is that while negligence is not as a general rule to be presumed, yet the injury itself may afford sufficient prima facie evidence of negligence, and the presumption of negligence may be created by the circumstances under which the injury occurred. The plaintiff cites the cases of *Hart v. Washington Park Club,* 157 Ill. 9; *Chicago City Ry. Co. v. Rood,* 163 Ill. 477; and *Jensen v. East St. Louis Ry. Co.,* 202 Ill. App. 583, as sustaining his contention. An examination of these cases cited discloses that they are not similar to the case at bar. The first two cases are personal injury cases. The *Hart* case expressly holds that the rule of *res ipsa loquitur* does not apply to the facts set forth in the declaration and a general demurrer was sustained to the same. The *Rood* case held that the facts as shown in the case were insufficient to raise a presumption of the carrier's negligence. The *Jensen* case held that the doctrine of *res ipsa loquitur* applies to the case where a passenger on an electric street car sustained an injury by jumping from the car to escape danger from a fallen trolley wire, when the flashes and reports from the fallen wire terrified the passenger. So far as we have been advised or able to ascertain neither our Appellate or Supreme Court has ever passed upon this identical question.

The defendant in his brief has cited a great many cases wherein this doctrine has been held not applicable when the suit has been against a doctor or a dentist for malpractice. Our courts, both Supreme and Appellate, have uniformly held that the doctrine *res ipsa loquitur* does not apply in such cases. The defendant contends that the same rules should be adopted in the case of a client suing an attorney, while the plaintiff contends that there is a distinction between the two.

The Supreme Court of Kansas in *Paulich v. Nipple,* 104 Kan. 801, in discussing this question, uses this language: "It has never been the rule that a lawyer who is not shown to be unskilled in his profession is liable because a client sustains damages by following his advice, honestly given, but which is subsequently determined by a final decision of a court to be erroneous. A physician stands in the same attitude as to liability for his mistakes as does a lawyer. No reason can be assigned for making a distinction between them, or for holding a physician or surgeon liable in damages for an honest error in judgment."

The Supreme Court of Indiana in the case of *Citizens Loan Fund & Savings Ass'n of Bloomington v. Friedley,* 123 Ind. 143, 7 L. R. A. 669, uses this language: "Attorneys are very properly held to the same rule of liability for want of professional skill and diligence in practice, and for erroneous or negligent advice to those who employ them, as are physicians, surgeons and other persons who hold themselves out to the world as possessing skill and qualification in their respective trades or professions. *Waugh v. Shunk,* 20 Penn. 130."

It will be observed from these cases that the rules of law governing the liability of persons for negligence and lack of professional skill and diligence in the practice of law and in the practice of medicine and surgery are the same. This we think is the law and the rules of evidence governing the trial of cases for malpractice against a lawyer are the same as those against a doctor or dentist.

In the case of *Ewing v. Goode,* 78 Fed. 442 (the leading case in the United States) the court, in discussing a similar case, used this language: "Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskillful or negli-

gent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury. The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, *'res ipsa loquitur,'* were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' ''

These principles of law have been stated in several decisions of the Appellate Courts of this State. *Sims v. Parker,* 41 Ill. App. 284, 286; *McKee v. Allen,* 94 Ill. App. 147, 153; *Moline v. Christie,* 180 Ill. App. 334; *Graiziger v. Henssler,* 229 Ill. App. 365, 374, and *Wallace v. Yudelson,* 244 Ill. App. 320. In *Moline v. Christie, supra,* it is said that it seems to be settled that the proof of the defendant's negligence can only be established by the testimony of experts skilled in the medical and surgical profession. In the present case the record is barren of any affirmative evidence showing negligence or want of skill on defendant's part. No physician or expert witness expressed the opinion that defendant, in and about his diagnosis of plaintiff's condition or in his examinations of plaintiff, failed in any particular to exercise proper care or skill. On the contrary the evidence shows that defendant was unusually diligent and painstaking. In the *Sims v. Parker* case, *supra,* it is said: ''Proof of a

bad result or of a mishap is of itself no evidence of negligence or lack of skill." Before a recovery could be had against defendant, it must be shown that his treatment was improper or negligent, not merely that he was mistaken, or that his treatment resulted injuriously to plaintiff.

In *Beckwith v. Boynton*, 235 Ill. App. 469, the court uses this language: "In an action against a physician for malpractice in the treatment of plaintiff's limb, it is not sufficient for plaintiff to show the facts surrounding the injury to the limb, the subsequent treatment, and the ultimate loss of the limb, but there must be expert testimony tending to show malpractice, or the jury may not draw inferences of negligence of the surgeon." *Quinn v. Donovan*, 85 Ill. 194. Numerous other cases, both in this and other jurisdictions, hold to this doctrine.

Our own Supreme Court in the case of *Priest v. Dodsworth*, 235 Ill. 613, 617, uses this language: "In a suit by a client against his attorney for damages charged to have resulted from the negligent management of business, the burden is on the plaintiff to prove the negligence charged. 'There is no presumption that an attorney has been guilty of a want of care, arising merely from his failure to be successful in an undertaking. On the contrary, he is always entitled to the benefit of the rule that every one is presumed to have discharged his duty, whether legal or moral, until the contrary is made to appear. In a suit against an attorney for negligence the burden is therefore on the plaintiff to allege and prove every fact essential to establish defendant's duty and a violation of it.' " It is our opinion that the plaintiff did not make out a prima facie case supporting the first count of the declaration and the trial court erred in overruling the defendant's motion for a directed verdict as to that count of the declaration.

After the court had overruled the motion for a directed verdict at the close of the plaintiff's evidence, the defendant introduced evidence to explain his actions in the defense of Harry Olson at the trial when he was charged with murder. A long hypothetical question embodying all the facts and circumstances as detailed by the witnesses, both for the plaintiff and defendant, relative to the trial of the second case of murder was prepared. This hypothetical question was read to several of the leading lawyers practicing at the Winnebago county bar. On account of the length of the question it was agreed between the parties to the litigation that all of the witnesses to whom the question was to be propounded should be in the court room to listen to the reading of the question. It was agreed that each should give his answer without the question again being read to him. The plaintiff in his printed brief states that he strenuously objected to this hypothetical question, since it did not contain all facts shown by the record; that it did contain facts not shown or proven in the case; that it was so long and involved that a witness could not remember or understand all the facts therein stated even though he tried, and that it was improper. An examination of the abstract does not disclose that the plaintiff made any objections whatsoever to this hypothetical question. In the plaintiff's argument he states that the hypothetical question as written was improper and should not have been given to the witness and the answer thereto not allowed to stand; that the hypothetical question does not include many important features and the question does include many features that are improper and not found in the evidence. Even if the abstract showed that objections had been made to the form of this hypothetical question this court will not search the record to find wherein the hypothetical question contains facts that should not have been in-

cluded therein or did not include facts that should have been included, for it was the duty of the attorney to point out to this court wherein the hypothetical question was improper. Any objection that the plaintiff may have made to the form and substance of this question has been waived by not presenting it in the proper manner to this court.

Hon. R. K. Welsh was the first witness called to answer the hypothetical question. In qualifying as an expert to answer this question Judge Welsh said that he lived in Rockford and had been practicing law 44 years; that he at one time was circuit judge in Winnebago county; that he had had experience as a judge and attorney in the practice of criminal law; that he had helped to prosecute felony and murder cases and had defended felony and murder cases in the circuit court of Winnebago county.

Mr. Roy F. Hall testified that he was a lawyer and had practiced his profession in Rockford for 24 years; that he had been in the active practice of law since 1896; that his practice had been general; that he had been engaged in many cases involving criminal law; that he had prosecuted one murder case and defended five defendants charged with murder; that he had practiced in the different courts of the State and federal courts and that he was familiar with the rules of practice of the various courts. (At this point of the testimony of Mr. Hall, Mr. Maynard, attorney for the plaintiff, announced that he would admit the qualifications of all of these men, meaning the attorneys that were to listen to the reading of the hypothetical question.) Mr. Hall said that he thought that he was acquainted with and knew what the proper practice was in the trial of criminal cases in Winnebago county and the State of Illinois.

Mr. John E. Goembel testified that he had practiced law for 43 years, 42 of which had been in Winnebago

county; that he has a general practice in the various courts of the State; that he had been engaged in the practice of criminal law; that the major part of his practice had been in that branch of the law; that he had represented a great number of people in their defense when they have been charged with a crime; that he was familiar with the rules and practices, in the circuit court of Winnebago county, and the rules of procedure in criminal cases and admissibility of evidence in the same. On cross-examination he stated that he had defended a great many cases when Mr. North was State's attorney. He said, "He is the hardest opponent that I ever went up against."

Mr. N. P. Nelson testified he has been practicing law in Winnebago county since 1906; that he was assistant State's attorney under Harry North, the defendant, for four years; that he had experience in the practice of criminal law and that he had represented defendants in numerous criminal cases.

Mr. Guy B. Reno testified that he had been admitted to practice law in 1917 and practiced his profession since that time in Winnebago county; that he is associated with Large & Reno and their practice is general; that he was assistant State's attorney for four years; that he took an active part in the prosecution of criminal cases in Winnebago county during that time; that he assisted in the prosecution of six murder cases; that he has defended 25 or more felony cases; that he is reasonably familiar with the rules and practice of the various courts of the State.

Each of the above witnesses testified that in his opinion assuming the facts to be as stated in the hypothetical question, Mr. North, in the defense of Henry Olson, used and exercised the same degree of care and diligence and ability that is usually and ordinarily and reasonably used by lawyers in good standing in that community.

Judge Welsh in his answer to the question stated: "I would say that in my opinion it was in keeping with good practice of the law in Winnebago County, Illinois, at that time to advise Henry Olson not to attempt to have the body of said Floyd Stotler exhumed. In my opinion it was in keeping with good practice in Winnebago County, Illinois, at the time to advise Henry Olson not to have his finger prints taken; and that it was in keeping with the good practice of law at the time and place in question not to give proof that on September 6, 1927, the said Henry Olson's hair had not been cut for four or five weeks. Inasmuch as from the assumption contained in the hypothetical question, it appears that Mr. Stotler was the only eye witness of this tragedy, I would say it was good practice. I would say it was in keeping with good practice of the law in Winnebago County, Illinois, at that time to advise Henry Olson that cross-examination of the witness Stotler with reference to all questions of identification should be completed even though it might require an unduly prolonged examination and that such examination might possibly tire the jury."

Mr. Roy Hall in addition to his answer to the hypothetical question, was asked another question in regard to the conduct of the defense, and answered: "Yes, I have an opinion, that he used good judgment and good practice, and especially in attempting to dodge other things that Mr. Pierce would get after Olson about. I think it was most excellent practice to advise Henry Olson not to attempt to have the body of Floyd Stotler exhumed. I think it was in keeping with good practice to advise Henry Olson not to have his finger prints taken and to advise Henry Olson not to submit proof that on September 6, 1927, his (the said Henry Olson's) hair had not been cut in four or five weeks."

Mr. Hall was also asked for his opinion in regard to the cross-examination of the witness, Orville Stotler, the father of the slain man, with reference to the question of identification, even though it might require prolonged examination and such that it might possibly tire the jury. To this question Mr. Hall answered: "Yes, I have an opinion about that. My opinion is it was Mr. North's business to break down that identification if the could, regardless of the time that it took; he had to make a record that would stand one way or the other; it was his business to do it."

The question was asked Mr. Hall, regarding the advisability of refusing to employ an expert to examine the gun that was found when George Bliss and Maurice Mahan were arrested for carrying concealed weapons, to ascertain whether the bullets that had been fired into the body of Floyd Stotler had been fired by this gun. Mr. Hall answered as follows: "There are several reasons why, in my opinion it was most excellent advice. In the first place, there has always been a question among writers and students as to whether or not a man could tell from what gun a bullet was fired—the moment that question arose, men began to talk against it as a science and it has never been an established science. My opinion is that the advice that Harry B. North gave to Henry Olson, as disclosed by the hypothetical question first read to me, was in keeping with the good practice of the law as it prevailed in the County of Winnebago, Illinois, at the time of said trial, by lawyers of reasonable care, skill and diligence, who were in good practice. I base it on this fact,— Harry North then, apparently, did not know what we know now. We know who the guilty men are now, and we can look back at it now in a different light than he could; as he came up to it, he had to use his best skill and diligence to present that question to the jury. One other thing I want to add to that answer—the world

knows now that Mr. Olson was not guilty and the world thought then that he was guilty.''

Without extending this discussion of the answers to the hypothetical question further, it is sufficient to say that Mr. John Goembel, Mr. N. P. Nelson, and Mr. Guy B. Reno, each testified to the same effect as Judge Welsh and Mr. Hall to similar questions asked them, each giving his reason for his answer to the question.

William L. Pierce was called as a witness and testified that he had practiced law since 1892, most of the time in Winnebago county; that he had prosecuted and defended other felony cases; that he was assistant State's attorney in 1927 in the prosecution of Henry Olson for the murder of Floyd Stotler; that he helped to prosecute Henry Olson twice; that the first time the jury disagreed; the second trial resulted in the conviction of Olson; that he had examined the transcript of the evidence on the preliminary hearing used by Harry North on the second trial of Mr. Olson; that he checked the evidence taken before the coroner's inquest and the evidence taken on the trial of Henry Olson which had been admitted in evidence on the trial of this case, and having in mind the facts as embodied in the hypothetical question relative to the negligence or mismanagement of the defense of Henry Olson, and whether Mr. North in the witness's opinion had exercised that degree of skill as was in keeping with good practice of his profession as a lawyer in the conducting of the case, he answered that in his opinion, ''That Mr. North used good judgment and it was good practice.''

Judge Arthur E. Fisher, one of the judges of the circuit court of Winnebago county, testified that he had lived in Rockford for 46 years; that he is one of the judges of the 17th judicial circuit and had been for seven years; that he remembered the indictment against Henry Olson charged with the murder of Floyd

Stotler; that the case was tried twice and that he presided at both trials; that he was present in court all times during the progress of the trial, including the selection of the jury and the returning of the verdict, where he could see and hear all that was going on during the whole time; that he heard the direct examination and the cross-examination of the witnesses, the selection of the jury and the return and discharge of the jury on both trials; that from his position in the court room he could hear all the testimony and. see everything that transpired in connection with both the first and second trials of Henry Olson.

The long hypothetical question was not propounded to Judge Fisher, but he stated that he had in mind the evidence of the second trial of Henry Olson for murder. The facts involved in the hypothetical question concerning the negligence and lack of skill of Mr. North in the trial of said case, were asked Judge Fisher, and he stated that he thought that Mr. North exercised good judgment and skill, such as other reputable lawyers would have done under similar circumstances on the trial of such a case.

The skill, ability and experience of each of these witnesses to testify to said facts is admitted by the plaintiff. This court cannot help but be impressed with the testimony of these witnesses because all of them, with the exception of Judge Fisher, have appeared as attorneys in the trial of cases in this Appellate Court. Judge Fisher, we know, tries many cases in the circuit court, and we have had occasion to review numerous cases in which he was the presiding judge, and entertain for his ability as a lawyer and judge a very high regard.

Counsel for plaintiff cites *Gambert v. Hart,* 44 Cal. 542, as sustaining his contention that expert testimony is not admissible to show that Mr. North was not negligent in the trial of this case. An examination of the

California case cited discloses that the attorney who was testifying was asked as a question of fact whether the facts as related by the plaintiff amounted to negligence of the attorney in the trial of the case. The trial court very properly sustained an objection to this question. The witnesses in the present case were not asked whether the acts of Mr. North amounted to negligence. They were asked to state whether, in their opinion, the plan of defense and the course of procedure followed by Mr. North in his conduct of the second trial of Henry Olson for murder (the facts being as stated in the hypothetical question) was the same as other reputable lawyers would have pursued under like circumstances. It is our opinion that submitting the hypothetical question to the witnesses was proper, and a question to be decided by expert testimony.

We have already indicated in this opinion that the doctrine of *res ipsa loquitur* does not apply, but assuming that it did apply, the defendant's evidence overcomes the presumption of negligence of the prima facie case made by the plaintiff. In the recent case of *Bollenbach v. Bloomenthal*, 341 Ill. 539, the court in discussing a malpractice case say: "The doctrine of *res ipsa loquitur* is, that whenever a thing which produced an injury is shown to have been under the control and management of the defendant and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford prima facie evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. The presumption or inference of negligence raised by the application of this doctrine is not absolute or conclusive but is rebuttable, and vanishes entirely when any evidence appears to the contrary. As is said by this court in *Coal Creek Drainage Dist. v. Sanitary Dist.*, 336 Ill. 11:

'A presumption is not evidence and cannot be treated as evidence. It cannot be weighed in the scale against evidence. Presumptions are never indulged in against established facts. They are indulged in only to supply the place of facts. As soon as evidence is produced which is contrary to the presumption which arose before the contrary proof was offered the presumption vanishes entirely.' '' *Garner v. Chicago Consolidated Traction Co.,* 150 Ill. App. 149.

In the case of *Blackburn v. Baker,* 237 N. Y. S. 611, a surgeon had performed an abdominal operation on a patient and left a piece of gauze with a metal strap attached, called a pack-off in the plaintiff's abdomen, at the close of the operation. The plaintiff apparently recovered from the operation but later had trouble, and an X-ray examination showed the gauze being present in her abdomen. She started suit against the surgeon for damages. She proved the employment of the surgeon, the operation, and the bad results, and rested her case. No medical testimony was given whatsoever in regard to the operation. The court in this case used the following language: ''Plaintiff's theory was that the leaving of the pack-off in the abdomen made the lack of skill and want of care so obvious that expert testimony was unnecessary. But defendant called an expert, who said that proper and approved methods were used in the operation, and thus inferentially that there was no negligence. He stated that it would have been unwise for defendant to have made a more extensive search for foreign substances in the abdominal cavity at the close of the operation, as it might have caused paralysis of the intestines; also that it was proper and customary for an operating surgeon to rely on the nurse's count of sponges, pack-offs, and gauze placed in and removed from the incision. Plaintiff did not rebut defendant's medical evidence that proper and approved methods were used. The presence of the

pack-off in the abdomen after the first operation, standing by itself, suggested that proper care had not been used, and required defendant to offer proof in explanation. But, when defendant's expert witness stated that proper and approved methods were used in the operation, the possible inference of negligence because the pack-off had been left in the abdomen was destroyed. In *Benson v. Dean,* 232 N. Y. 52, 53, 133 N. E. 125, a surgeon broke a needle while closing an incision. The plaintiff there sought to establish his case without medical evidence, contending that the want of care was so obvious that expert testimony was unnecessary. Judge Pound says in the opinion in discussing this feature of the case (232 N. Y. 57, 133 N. E. 127): 'The court instructed the jury, over defendant's exception, that the mere breaking of the needle alone was not necessarily negligence, but might be some evidence of negligence. The plaintiff failed to offer any evidence to rebut defendant's evidence that surgical needles occasionally break, even when the operator uses the highest degree of skill and care. The evidence of the first operation, coupled with the presence of the broken needle in the abscess, standing by itself, might . . . have been enough to put defendant to his proof.' *Goldstein v. Pullman Co.,* 220 N. Y. 549. Common sense suggests that the condition discovered by Dr. Saphir was incompatible with successful surgery and medical treatment. But when the evidence of the defendant's surgeons came into the case, with a reasonable explanation showing what may happen when the proper degree of care and skill is actually exercised, the possible inference of negligence from the breaking of the needle alone was driven out, and the jury should have been so instructed. The rule of *res ipsa loquitur* put upon the defendant the burden of going on with the case (*Davis v. Kerr,* 239 Pa. 351, 46 Atl. 1007, 46 L. R. A. [N. S.] 611), but, in the absence of medical evidence

to the contrary, it must be assumed on this appeal that the breaking of the needle was not due to negligence.' '' It is our opinion that any presumption that may have prevailed in behalf of the plaintiff at the close of his case, that the defendant was negligent in the conduct of plaintiff's defense when he was charged with murder, has been completely overcome by the evidence of the defendant. The plaintiff failed to prove the defendant guilty of negligence as charged in his declaration.

The second count of the declaration charges the same acts of negligence on the part of the attorney as the first count and in addition thereto charges that Mr. North was guilty of bad faith and unfair dealing with his client, for the reason that prior to the second trial for murder of the plaintiff, George Bliss, who was the actual killer of Floyd Stotler, had confessed to Mr. North that he was the guilty party. When Mr. North accepted the task of defending Henry Olson on the charge of murder, the law required of him the utmost degree of fidelity and fair dealing to his client and if he had knowledge at the time he was defending Henry Olson, that George Bliss was the guilty party, who committed the murder and he was also representing George Bliss at the time, he would be guilty of gross misconduct. As stated in the case of *People v. Gerold,* 265 Ill. 448, ''The rule has long been firmly estab-. lished that an attorney cannot represent conflicting interests or undertake to discharge inconsistent duties. When he has once been retained and received the confidence of a client he cannot enter into the service of those whose interests are adverse to that of his client . . . no matter how honest his motives and intentions.''

The defendant concedes this to be the law but most emphatically denies that he had any knowledge that George Bliss had committed the murder of Floyd Stot-

ler until several days after the jury by their verdict had found Henry Olson guilty of the murder. It, therefore, becomes a question of fact whether Mr. North had such knowledge at the time of the second trial of Henry Olson. The only witness that testified positively that Mr. North, at the time he was defending Henry Olson, knew that George Bliss had committed this murder, is George Bliss himself. He testified that he had a conversation with Mr. North in the court room at Rockford, in which Mr. North told him about the second trial of Henry Olson, and also that he knew that Olson was not guilty and suggested that Bliss come to his office and see him; that he went to Mr. North's office and as he entered he saw Mr. North's stenographer, Bernice Oxley, and spoke to her as he entered the office; that he then went into the private office of Mr. North and told him how he had held up the filling station and in doing so he shot and killed Floyd Stotler.

Mr. North, the defendant, positively denies that he had any such conversation with George Bliss, either in the court room or in his office or anywhere else, in which Bliss told him that he had killed Floyd Stotler. He denied that he had ever talked to Bliss about the murder of Floyd Stotler, either in the court room or at his office, and that Bliss had never been in his office.

Shortly after the conviction of Henry Olson on the charge of murder, George Bliss, and his confederate, Maurice Mahan, were arrested and taken to the courthouse at Rockford, at which time they made a confession and told the whole story as to how they had held up the filling station and Bliss had fired the fatal shots that killed Floyd Stotler. William L. Pierce, at that time assistant State's attorney, and who had assisted in the prosecution of Henry Olson, was present. He testified that Bliss stated that at that time he had talked to no one and no one had talked to him about

this murder. After the confession was taken the Honorable William B. Knight, the State's attorney, had a conversation with Bliss. Mr. Knight testified that Bliss told him at that time that he had told no one about the murder until the day before, that being the time of his confession. On July 12, 1929, a short time after the declaration had been filed in the present suit, Mr. Charles H. Linscott and Frank P. North, both of the firm of which Harry North is a member, went to the penitentiary at Joliet, Illinois, and had a conversation with George Bliss, in which they told him a suit had been started by Henry Olson against Harry B. North for damages; that in the suit Olson charged that he, Bliss, had told Harry B. North that he was the one that had killed Stotler. When asked whether he ever told Mr. North that he was the guilty party, he replied, ''I never told anybody anything about the Stotler case before I plead guilty.''

At the time of the confession Judge Welsh was present and heard all that was said at that time. Judge Welsh testified that Bliss said, ''It was in my mind that if Olson could get away and not suffer the punishment I would not say anything.'' Bernice Oxley, Mr. North's stenographer, was called as a witness and testified that to her best recollection she had never seen George Bliss in the office of Mr. North while she was employed by that firm. Homer Read, a member of the police force, testified that at the time of the confession of Mahan and Bliss he was present; that Mahan and Bliss were in separate rooms; that Bliss on being told that Mahan had confessed said, ''Let me in the room with that man for ten minutes and I will kill him.''

The plaintiff called three men who had sat as jurors in the trial of the murder case of Henry Olson. They testified that Harry B. North made the opening statement at said trial; that he said in substance that he would produce the parties who committed the murder,

or the party that committed the crime; that Henry Olson was innocent and he would produce the actual killers before the trial ended. Judge Arthur E. Fisher, presiding judge at the time of the hearing of the murder trial, William D. Knight, State's attorney, and William B. Pierce, his assistant, who prosecuted the case in behalf of the people and three men who also sat as jurors in the case testified that no such statement was made. Judge Fisher's, Mr. Knight's and Mr. Pierce's evidence is entitled to much more weight in our opinion than that of the jurors, for if such startling statements had been made, it certainly would have been impressed upon the mind of the trial judge and the State's attorney and his assistant. This compels us to the belief that no such statements were made by Mr. North.

It is undisputed that George Bliss is a convicted felon now serving time in the penitentiary at Joliet for the murder of Floyd Stotler. The records show that Harry B. North has been a practicing attorney in good standing at the Winnebago bar for years; that the people honored him by electing him State's attorney and that he was a vigorous prosecutor and represented the people of Winnebago county to the best of his ability. As far as this record shows there had never been a question about his ability, integrity or loyalty to a client until this suit was started.

Much evidence was introduced and considerable space devoted in the arguments of each of the litigants in this case, to show how Mr. North finally received the information that George Bliss was the party that had killed Floyd Stotler, and who should receive credit for the apprehension and conviction of Bliss and Mahan. In our view of the case this has no bearing upon its merit, for the plaintiff has failed in his proof to show that Mr. North had knowledge of this fact prior to the conviction of Henry Olson.

From a consideration of all the evidence, the character of the witness, Bliss, and the numerous instances in which he has been contradicted, and also the character and experience of Mr. North as shown by the record, we are impelled to the belief and we so find as a question of fact, that the witness, George Bliss, did not tell Harry B. North that he was the guilty party that had killed Floyd Stotler, prior to the time of the conviction of Henry Olson for murder.

The defendant assigned as error that the trial court erred in admitting certain evidence. Especially does he complain of the conversation that is alleged to have occurred between Henry Olson and the defendant. The plaintiff testified that immediately after the reading of the verdict of the second trial he went into the lawyer's room at the courthouse and Mr. North suggested that they appeal the case to the Supreme Court, and that Mr. North said it would cost $5,000; that plaintiff replied they did not have $5,000; that Mr. Frank North, Harry B. North's son, suggested to the mother of the plaintiff that she put a mortgage on her house to raise the money, and that the defendant said, "You would better spend the money than go to prison." It is our opinion that the court erred in admitting this evidence and that it was prejudicial to the defendant. The declaration does not charge the defendant with any negligence or misconduct of the case after the verdict of the jury. Mr. North denies that such a conversation took place. The attorney for the plaintiff in his argument to the jury commented upon this evidence, no doubt with telling effect as at the time the present trial took place, $5,000 for taking the case to the Supreme Court, to the ordinary juror, might seem an exorbitant fee. It seems to us that the testimony of Mrs. Eckloff should not have been admitted without an explanation of the testimony "of what proof, if any, Mr. North was working upon." Over the objec-

tion of the defendant the plaintiff was permitted to have read in evidence an excerpt from the argument of Mr. Knight, the State's attorney, to the jury, in the prosecution of Mr. Henry Olson for murder at the second trial. Mr. North had nothing whatsoever to do with this argument before the jury, and it was error to admit this evidence.

Mrs. E. J. Bliss, called as a witness on behalf of the plaintiff, testified she saw Arthur Schmauss in the defendant's office on February 11. Evidently this testimony was offered for the purpose to establish the time when Mr. North obtained knowledge that George Bliss committed the murder of Stotler. The above assignments of error are fully argued in the brief of the defendant, but for some reason the plaintiff has not seen fit in his printed brief and argument to answer any of these arguments and enlighten us on what theory this evidence was admitted in evidence. So we must necessarily hold that the same was improper.

The defendant testified to a conversation that he had with one Hap Floberg, concerning a talk that Floberg had had with Mr. Frank Maynard, the attorney for the plaintiff. Mr. Maynard called himself as a witness and over the objection of the defendant, testified that he had had no conversation whatever with Hap Floberg as related by Mr. North. On cross-examination the question was asked Mr. Maynard if he and Mr. North were good friends. Mr. Maynard objected to the question on the ground that it was incompetent, irrelevant and immaterial, and the court sustained the objection. The question was repeated in a different manner to the witness and the objection was also sustained to that question. The question was then asked the witness, "Do you remember the occasion in Harry North's office,"—— and before the question was finished Mr. Maynard answered, "I would like to answer that question. I have a feeling

against Harry North in this case for the things that I know he has done." At this point Mr. Brown, one of the attorneys for the defendant, objected to the answer and the witness continued: "The same as I would have against any other attorney that was in the same position." On motion of the attorney for the defendant the latter part of the answer was stricken out. On further questioning as to how long this feeling had existed, Mr. Maynard objected to the question and the court sustained the objection. The defendant strenuously insisted that the testimony of Mr. Maynard was highly prejudicial. No doubt Mr. Maynard felt that it was necessary for him to testify and refute the testimony in regard to what the witness said that Floberg said Maynard had asked him. Our courts have frequently criticized an attorney for taking the witness stand in a case in which he is the attorney. *Judy v. Judy,* 261 Ill. 470. Although the court struck from the record the objectionable part of Mr. Maynard's answer the damage had been done and the impression that the jury got from this evidence was highly prejudicial to the defendant.

There are other assignments of error in the admission and rejection of evidence which we have considered, but which, in view of our conclusion, it is unnecessary for us to pass upon.

The defendant complains of plaintiff's given instruction number three. This is an instruction in regard to the amount of proof required by the plaintiff in order to recover. The case cited in support of their contention that this instruction is correct does not contain the objectionable words in regard *to the competent* evidence. We can hardly see how the jury can be misled by the giving of this instruction, but the same has been criticized by our Supreme Court and should not have been given. Instruction number five, that the weight of the testimony does not necessarily depend on

the greater number of witnesses, sworn on either side, was criticized severely by this court in the case of *Rynearson v. McCartney*, 203 Ill. App. 555. Instruction number 12 was relative to the credibility of expert witnesses. We do not see wherein the defendant could be prejudiced by the giving of this instruction. Instruction number 13 is in regard to the hypothetical question. We think the court did not err in giving this instruction.

The defendant assigns as error the submission of the special interrogatory to the jury and claims that the same as submitted contains two distinct propositions in which the jury should make a finding. He relies on the case of *Ingalls v. Allen*, 43 Ill. App. 624. The court in this case held that the particular interrogatory as offered should not be given to the jury as the same was double. The giving of this instruction in nowise prejudiced the defendant's case, and we do not think that it was error for the court to have given it.

Complaint is made that the attorney for the plaintiff in his closing argument to the jury used inflammatory language and greatly prejudiced the defendant in the eyes of the jury. One part of the argument objected to was the failure of the defense to call Judge Edward Shurtleff as a witness to rebut the statement of George Bliss, that he, Bliss, had made the same statement to Judge Shurtleff as he had to Mr. Maynard. This statement was made after Bliss made the statement to Mr. Maynard, and whether George Bliss ever made the same statement to Judge Shurtleff is immaterial and not binding on the defendant as it does not tend to prove that Mr. North, the defendant, had any knowledge of the guilt of George Bliss as the murderer of Floyd Stotler, prior to rendition of the verdict in the trial of Henry Olson for the same murder.

The objection to this argument should have been sustained.

During Mr. Maynard's closing argument numerous objections were interposed by the attorney for the defendant to the argument. Seventeen of these objections were sustained by the trial court. Many others could have been sustained without prejudicing the rights of the plaintiff. It needs but a cursory examination of this record to disclose the bitter feeling that existed between the parties and attorneys in this litigation. It is replete with instances that show the ill feeling toward each other. The record also disclosed that the feeling in the community as to the guilt or innocence of Mr. North was very manifest. A judge from a different circuit was called to hear the case, and the people generally were discussing the case, no doubt many expressing their opinions openly in regard to its merits. It would be impossible to try such a case without the jury, to some extent, being aware of the feeling and publicity that was being given to this case. Under such circumstances the attorneys for the respective parties should have been most careful in their arguments to the jury not to go outside of the record in discussing the case and the argument should not have been of an inflammatory character. Our Supreme and Appellate Courts on numerous occasions have criticized inflammatory arguments to the jury and have reversed cases for this reason alone. From a reading of this argument we are bound to conclude that the arguments in this case were objectionable and of an inflammatory nature.

The jury by its verdict fixed the plaintiff's damages at $29,250. On the hearing of the motion of the defendant for a new trial the court gave the plaintiff his choice of filing remittitur of $21,750 and reducing the amount on which judgment could be rendered to $7,500 or a new trial would be granted. The plaintiff

elected to file a remittitur and accept the amount of the judgment as $7,500. The defendant seriously contends that this is positive proof that this verdict was the result of prejudice, passion and a misconception by the jury of the real facts in the case. In the early case of *Chicago & N. W. Ry. Co. v. Cummings,* 20 Ill. App. 333, in discussing a case where the court had ordered a remittitur the court has this to say: "While it must be said that by the law as settled, it is in the power of the trial court to render judgments on verdicts reduced as the one under consideration was, to an amount satisfactory to the trial judge, and the entering of such judgment is not error, yet the judgment so rendered is anomalous, and in a reviewing court, cannot be entitled to the presumptions which obtain in favor of a judgment upon a fair verdict, which results from concurrence upon all the issues by the jury and the court. In the exercise of the revisory power of this court, we may reverse a judgment rendered under such circumstances as appear in the record, notwithstanding there appear to be no errors of law, where, in our opinion, such course will best tend to promote the impartial administration of justice. In view of all the circumstances shown by the evidence in this record, and the impeaching of the verdict by the trial judge, in which appellee concurred by entering a remittitur of so large a part of the verdict, we conclude that the better and more prudent course, the one most likely to conserve the rights of both parties, and approximate justice most nearly in the end, is to submit the issues between the parties to the consideration of another jury."

This case was followed by the Appellate Court in the case of *Chicago City Ry. Co. v: Fennimore,* 78 Ill. App. 478, and the court in discussing the remittitur say: "The jury returned a verdict for fifteen thousand dollars in favor of appellee. According to the

judgment of the trial court, which had the parties and witnesses before it, this verdict was four times too large. We are not to be understood as condemning the practice of requiring a remittitur in proper cases. But a verdict so excessive that four-fifths of it will be remitted to prevent a new trial, as is said in *C. & N. W. Ry. Co. v. Cummings*, 20 Ill. App. 333, 'cannot but be regarded as the result of passion and prejudice on the part of the jury, and it is difficult to see how the vice in such a verdict can be cured by a remittitur, for the passion and prejudice was in the jury and must have entered into and permeated the whole finding, and must abide in that which remains as well as in that which is remitted.' "

The trial court in the present case saw fit to require the plaintiff to reduce the amount of the verdict approximately 75 per cent. This indicates to us that the verdict was largely the result of passion and prejudice of the jury in this case.

The judgment of the circuit court of Winnebago county should be and the same is hereby reversed and the case remanded.

*Reversed and remanded.*